Warren J. Stapleton, AZ 018646
Joseph Roth, AZ 025725
Travis C. Hunt AZ 035491
Osborn Maledon PA
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012-2794
Tel: (602) 640-9000
Fax: (602) 640-9050
wstapleton@omlaw.com
jroth@omlaw.com
thunt@omlaw.com
Attorneys for Receiver Kimberly Friday

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JAN 17 2020**

JEFFREY P. COLWELL
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Federal Trade Commission,<br><br>Plaintiff,<br><br>v.<br><br>James D. Noland, Jr., a/k/a Jay Noland and J.D. Noland, individually and as an officer of Success By Media Holdings Inc. and Success By Media LLC;<br><br>Lina Noland, individually and as an officer of Success by Media Holdings Inc. and Success By Media LLC;<br><br>Scott A. Harris, individually and as an officer of Success By Media LLC;<br><br>Thomas G. Sacca, Jr., individually and as an officer of Success By Media LLC;<br><br>Success By Media Holdings Inc., a corporation, also d/b/a Success By Health and Success By Media; and<br><br>Success By Media LLC, a limited liability company, also d/b/a Success By Health and Success By Media<br><br>Defendants. | Case No. _____<br><br>**NOTICE OF ORDER APPOINTING RECEIVER PURSUANT TO 28 U.S.C. § 754**<br><br>**U.S. District Court**<br>**District of Arizona**<br><br>**Case No. CV 20-00047-PHX-DWL** |

On January 8, 2020, the Federal Trade Commission filed a complaint against Defendants in the United States District Court for the District of Arizona.  Attached hereto as Exhibit A is a true and correct copy of the Complaint.  Court-Appointed Receiver, Kimberly Friday, by and through undersigned counsel, hereby provides notice pursuant to 28 U.S.C. § 754, that on January 13, 2020, the Court entered a Temporary Restraining Order (the "TRO") as to Defendants James D. Noland, Jr., a/k/a Jay Noland and J.D. Noland, Lina Noland, Scott A. Harris, Thomas G. Sacca, Jr., Success By Media Holdings Inc., a corporation, also d/b/a Success By Health and Success By Media; and Success By Media LLC, a limited liability company, also d/b/a Success By Health and Success By Media (collectively the "Receivership Defendants").  In conjunction with the entry of the TRO, the Court appointed Ms. Friday as Receiver over the Receivership Defendants as identified in the TRO at pages 16-21.  A true and correct copy of the TRO is attached hereto as Exhibit B.

DATED this 16th day of January, 2020.

OSBORN MALEDON, P.A.

_____
Warren J. Stapleton
Joseph N. Roth
Travis C. Hunt
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793

Attorneys for Receiver Kimberly Friday

# EXHIBIT A

ALDEN F. ABBOTT
General Counsel

EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC  20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2726; jware1@ftc.gov (Ware)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>    Plaintiff,<br><br>  v.<br><br>James D. Noland, Jr., a/k/a Jay Noland and J.D. Noland, individually and as an officer of Success By Media Holdings Inc. and Success By Media LLC;<br><br>Lina Noland, individually and as an officer of Success by Media Holdings Inc. and Success By Media LLC;<br><br>Scott A. Harris, individually and as an officer of Success By Media LLC;<br><br>Thomas G. Sacca, Jr., individually and as an officer of Success By Media LLC;<br><br>Success By Media Holdings Inc., a corporation, also d/b/a Success By Health and Success By Media; and<br><br>Success By Media LLC, a limited liability company, also d/b/a Success By Health and Success By Media,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>**DOCUMENT SUBMITTED UNDER SEAL** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b; the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R. Part 435; and the Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations ("Cooling-Off Rule"), 16 C.F.R. Part 429, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the Merchandise Rule and the Cooling-Off Rule. ·

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 57b.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2-3) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Merchandise Rule, 16 C.F.R. Part 435, which requires mail-, Internet-, or phone-based sellers to have a reasonable basis for advertised

shipping times, and, when sellers cannot meet promised shipping times or ship within 30 days, to obtain the buyer's consent for a delay or provide a refund. The FTC also enforces the Cooling-Off Rule, 16 C.F.R. Part 429, which requires sellers of certain goods or services at places other than the seller's place of business to notify purchasers of their right to cancel the transaction within three business days.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b; 16 C.F.R. Part 435; 16 C.F.R. Part 429.

## DEFENDANTS

6.      Defendant Success By Media Holdings Inc. ("SBM Holdings"), also doing business as Success By Health ("SBH") and Success By Media, is a Nevada corporation with its principal place of business at 2875 Saint Rose Parkway, Suite 100, Henderson, NV 89052. SBM Holdings transacts or has transacted business in this District and throughout the United States. SBH is or was an unincorporated division of SBM Holdings.

7.      Defendant Success By Media LLC ("Success By Media"), also doing business as SBH and Success By Media, is a Nevada limited liability company with its principal place of business at 2875 Saint Rose Parkway, Suite 100, Henderson, NV 89052. Success By Media transacts or has transacted business in this District and

throughout the United States. Success By Media is a wholly owned subsidiary of SBM Holdings. SBH is or was an unincorporated division of Success By Media.

8.     Defendant James D. Noland, Jr. ("Jay Noland"), also known as Jay Noland and J.D. Noland, is an owner, director, chief executive officer, president, and treasurer of SBM Holdings. He also is a manager and chief executive officer, and previously was an owner, of Success By Media and the founder and chief executive officer of SBH. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media, SBM Holdings, and SBH, including the acts and practices set forth in this Complaint. Defendant Jay Noland, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.     Defendant Lina Noland (together with Jay Noland, the "Nolands") is an owner, officer, director, and corporate secretary of SBM Holdings. She also is a manager, and previously was an owner, of Success By Media. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media, SBH Holdings, and SBH, including the acts and practices set forth in this Complaint. Defendant Lina Noland, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10.     Defendant Scott A. Harris ("Harris") is the president and an officer, and previously was a senior field advisor, of Success By Media and SBH. At all times

material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media and SBH, including the acts and practices set forth in this Complaint. Defendant Harris, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.    Defendant Thomas G. Sacca, Jr. ("Sacca") is the chief visionary officer, and was previously the chief sales officer and a senior field advisor, of Success By Media and SBH. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media and SBH, including the acts and practices set forth in this Complaint. Defendant Sacca, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

12.    Defendants SBM Holdings and Success By Media (collectively, "SBM Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices described below. SBM Defendants have conducted the business described below through both SBM Holdings and Success By Media, which have or had common ownership, officers, managers, business functions, and office locations. Because the SBM Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

13.    Defendants Jay Noland, Lina Noland, Harris, and Sacca had knowledge of, and have formulated, directed, controlled, had the authority to control, or participated in,

the acts and practices of the SBM Defendants that constitute the common enterprise. According to Harris, the Nolands were involved in product development, website development, sales, overseeing management, and "pretty much everything you see. . . . Mr. Noland and his wife Lina Noland, they've got, they're all, they're all involved in all of it."

## COMMERCE

14.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

15.     SBM Defendants' unincorporated SBH division distributes coffee, tea, and dietary supplements through a network of independent distributors called "Affiliates."

16.     To convince consumers to enroll as Affiliates, Defendants claim that Affiliates likely can replace their job income in six months and become financially free (and never have to work again) in 18 months by working hard and following Defendants' instructions.

17.     These claims are false, and, in reality, Defendants have been operating a pyramid scheme since SBH's inception in or about July 2017.  Most SBH Affiliates have lost money in the program.  SBH's commission plan emphasizes and incentivizes recruiting new Affiliates over selling products to ultimate users or consumers outside of

the organization. SBH's business practices also make it unlikely that Affiliates can meaningfully earn money by selling products to outside customers.

18.     In many instances, Defendants fail to timely ship products to Affiliates and other consumers who place product orders. When those consumers complain to the company, seek a refund from the company, or seek a chargeback through their credit card company, Defendants respond with threats and lawsuits.

19.     Defendants also host SBH and Success by Media events at hotels and additional locations other than their place of business. At those sometimes-mandatory events, Defendants use high-pressure sales tactics to force Affiliates to buy expensive consumer goods and services, including SBH products and tickets to future training events, without informing Affiliates of their legal right to cancel those transactions.

**The SBH Marketing Scheme**

20.     Consumers pay an annual membership fee of $49 to become SBH Affiliates, making them eligible to sell SBH products and receive rewards for doing so.

21.     Each SBH Affiliate receives a distinct URL that directs consumers to the Affiliate's SBH website, a duplicate of the main SBH website. Product purchases made on either the Affiliate's copy of the SBH website (the "Affiliate Website") or on the main SBH website are handled identically—SBH receives the proceeds of the transaction and is responsible for fulfilling and shipping the order. Purchases made by Affiliates or non-Affiliates on an Affiliate Website, including purchases made by the Affiliate himself or herself, result in the Affiliate receiving credit for the sale toward commissions.

22.     Any member of the public can buy SBH products from the company's website, or an Affiliate Website, at the same "wholesale" price that SBH offers to Affiliates.  SBH sets the pricing both on its website and on the Affiliate Websites. Affiliates do not have the ability to offer different prices on the internet.

23.     Only SBH Affiliates are eligible to recruit a "downline" of additional SBH Affiliates and to earn commissions and other rewards based on purchases made through their own or their downline's Affiliate Websites.

24.     In practice, because SBH requires Affiliates to accrue $20 in commission before they can receive a payout and because SBH commissions generally do not exceed 10% of the purchase amount, an Affiliate or his or her downline must purchase, or generate purchases of, at least $200 from SBH before the Affiliate can receive any commission.

25.     Affiliates only become eligible for certain rewards by increasing their SBH "rank."  The current 11 ranks range from "Business Affiliate" ("BA"), which requires $5,000 in monthly purchase volume from the Affiliate and the Affiliate's downline, to "5 Star Diamond," which requires $1.25 million in monthly purchase volume from the Affiliate and the Affiliate's downline.  To qualify for each rank, no more than 50% of the Affiliate's qualifying purchase volume can come from a single downline Affiliate or that Affiliate's own downline.

26.     If Affiliates lack the downline volume to meet the monthly purchase volume requirements, they can personally purchase products to make up the difference and qualify for new rewards.

27. Each Affiliate's rank resets every month. Therefore, to maintain his or her rank, an Affiliate must consistently meet the relevant purchase thresholds.

28. In addition to other forms of compensation, Affiliates earn percentage-based commissions on total sales volume at various "tiers" within their downlines. "Tier 0" is the Affiliate himself or herself. "Tier 1" is recruits of the Tier 0 Affiliate. "Tier 2" is the Tier 1 Affiliates' recruits, "Tier 3" is the Tier 2 Affiliates' recruits, and so on.

29. The percentage-based commissions that an Affiliate earns depend on two variables: the Affiliate's rank and the tier at which purchases occurred. As an Affiliate's rank increases, the Affiliate can access commissions at additional tiers and increase the applicable commission percentage at each tier. The table below, from SBH's marketing materials, provides the percentage commissions by rank and tier:

| Tiers | Retail Customer | Affiliate | Business Affiliate | Super Business Affiliate 1 | Super Business Affiliate 2 | Super Business Affiliate 3 | Super Business Affiliate 4 | 1 Star Diamond | 2 Star Diamond | 3 Star Diamond | 4 Star Diamond | 5 Star Diamond |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbreviation | C | A | BA | SBA1 | SBA2 | SBA3 | SBA4 | 1SD | 2SD | 3SD | 4SD | 5SD |
| 6-TIER RESIDUAL TEAM COMMISSION | | | | | | | | | | | | |
| TIER 0 | | | | | | | 10% | | | | | |
| TIER 1 | | 8% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| TIER 2 | | 7% | 5% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% |
| TIER 3 | | 1% | 2% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| TIER 4 | | 1% | 1% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| TIER 5 | | | | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |

30. Under this plan, a hypothetical Affiliate, "Joe," with a rank of Super Business Affiliate 1 ("SBA1") earns 10% commission on purchases made by Joe and by Joe's "Tier 1" members—those Affiliates that Joe recruited personally. Joe also earns 10% commission on orders placed through his or his Tier 1 members' Affiliate Websites. Joe earns 6% on Tier 2 purchases, 4% on Tier 3 purchases, 3% on Tier 4 purchases, and 2% on Tier 5 purchases. An Affiliate without any elevated rank, by contrast, earns 8%

commission on Tier 1 sales, 2% on Tier 2, 1% on Tier 3, and no commission on Tiers 4 and 5.

31.     Defendants also pay various bonuses based on recruiting new Affiliates who purchase $500 or $1,995 "product packs" upon enrollment. For example, Defendants' "5x5 bonus" paid cash bonuses of up to $10,000 for recruiting five new Affiliates, each of whom purchased a product pack and recruited five new Affiliates who also purchased product packs.

32.     Achieving SBA1 status—and gaining access to all five tiers of commission, in addition to other bonuses and rewards—requires an Affiliate and that Affiliate's downline to purchase, or have others purchase through one of their Affiliate Websites, $15,000 in products in one month.

33.     Jay Noland, Lina Noland, Harris, and Sacca all participated in developing or revising SBH's commission plan for Affiliate compensation.

34.     SBH's flagship product is its "MycoCafé" brand of instant coffee, which Defendants attempt to differentiate from other coffees by touting the inclusion of "ganoderma," a mushroom that Defendants call the "king of herbs" for its myriad purported health benefits.

35.     SBH is in a self-proclaimed "build-out" stage. The company's recruiting and marketing materials explain, using the visual below or other materials, that SBH plans to capture 1% of the world coffee market in 5-7 years, which will result in $24 billion in annual revenues.



36. Over two years into SBH's 5-7 year plan, its annual revenues have yet to exceed $5 million.

37. From July 2017 through June 2019, more than 500 consumers in this District made more than 1,900 purchases from Defendants, totaling more than $460,000.

**Defendants' False Income and Lifestyle Claims**

38. Defendants promote their scheme through videos and presentations on the SBH website; in materials provided to Affiliates for recruiting purposes; on videos and statements posted to an Affiliates-only Facebook group that is administered exclusively by the Nolands; on daily "SBH Heat" conference calls for SBH Affiliates; and during in-person training and recruiting sessions.

39. In these settings, Defendants lure consumers into SBH, and encourage aggressive purchasing by already-enrolled consumers, with claims that SBH provides a life-changing financial solution.

40.     Defendants Jay Noland, Lina Noland, Harris, and Sacca have all promoted recruitment and continued participation in SBH.

41.     Defendants frequently tell consumers that they likely will replace their job income within six months and obtain "financial freedom" within 18 months if they work hard and follow Defendants' instructions.

a.     Jay Noland told SBH Affiliates that, by following his instructions for six months, you "can have a reasonable expectation that you would have replaced your income if you were results-oriented and focused."

b.     On one SBH Affiliate conference call, Jay Noland explained that "replacing your income at your job in six months or less . . . really starts with just thinking right," as depicted in the following SBH advertisement:



c.     Jay Noland also told SBH Affiliates that if they "just applied [his system], without fail, you should be able to be financially free in 18 months."

      d.     In a video posted to Facebook in March 2018, Jay Noland told SBH Affiliates that some of them "by the end of this year [would] never, ever have to work again."

      e.     Sacca told SBH Affiliates that if "we're out there busting this thing for 12 to 18 months, it's going to give us a lifetime of freedom."

42.    In multiple scripts provided to Affiliates for recruiting purposes, Defendants claim that "several people" are "achieving Financial Freedom already with our company."

43.    Defendants also frequently tell SBH Affiliates and recruits that Jay Noland is the "Millionaire Maker" and has trained many millionaires in past multilevel marketing programs.  Defendants explain that Noland is applying the same lessons in SBH, thereby offering Affiliates an opportunity to become "coffee millionaires."

      a.     Success By Media's website refers to Jay Noland as the "millionaire maker."

      b.     Jay Noland calls many of his Facebook videos for SBH Affiliates "Millionaire Mentorship" trainings.

      c.     On one Millionaire Mentorship training, Jay Noland declared that he would create "1,000 millionaires" through SBH.

      d.     In another Millionaire Mentorship training, Jay Noland said that he was training people to make "$1 million per year" "forever."  He then asked, "Who in the hell would have the audacity to talk about that type of money?,"

before proceeding to claim that he could train Affiliates to make $1 million "year after year whether you work or not."

      e.     Harris told SBH Affiliates that he had "watched [Jay Noland], through the years, build way too many millionaires and multi-millionaires, go out and do billions in volume."

      f.     Harris also told Affiliates, "All that matters is are you out there building it the way that Mr. Noland teaches us to build it? And if you are, the rewards are gonna come no matter what, that's the way I feel about it."

      g.     SBH's director of sales told Affiliates on a company conference call that they could be "financially free and be making a five-figure income possibly on a monthly basis residually." He continued, "This is not a theoretical example. It's fact. I'm just talking about what's happened in the past and the people that Mr. Noland has worked with, trained, and taught and the companies that he's developed. And what's happening with Success By Health is like no other."

44.     Defendants encourage Affiliates to sign a "Million Dollar Contract." In that "contract," Affiliates agree that they are "100% committed to my goals and dreams" and that "[f]or the next 18 months I'm willing to do whatever it takes to make my dreams a reality." Affiliates then commit to maintain a $500 monthly auto-order from the company for at least 18 months, to attend "all SBH Corporate trainings and events no matter what," and to "ask at least 4 people a day to join my business at least 5 days a week for at least 18 months," among other things.

45.     Referencing SBH's goal of $24 billion in annual revenues in 5-7 years, described in paragraph 35 above, Defendants claim that Affiliates' fortune will come from a pool of $12 billion in anticipated annual payouts to Affiliates.  Defendants base that $12 billion projection on, among other things, their claim that SBH shares approximately 50% of its revenues with Affiliates.  Defendants highlight the $12 billion figure in recruiting materials and promotional videos featuring Jay Noland with the following images:



46.     Defendants also tout Affiliates' potential to earn unlimited income.

a.      One SBH training document tells Affiliates that the company's commission plan "provides for UNLIMITED Income.  You can earn as much money as you want.  There is NO LIMIT on the width of the affiliates you can refer to the program."

b.      An "SBH Prospecting System" document tells Affiliates how to pitch the program to recruits.  The document provides a closing script that allows Affiliates to fill in the blanks for consumers' potential earnings if they join the company:

STEP 4: 4 CLOSING QUESTIONS

1. "Now, how much money would you need to make on a monthly basis, for this business to be worth your time?"

2. "How many hours per week could you put towards working your SBH business in order to get to $_____ / month?"

3. "How long (months or years) would you be willing to work _____ hours per week to reach $_____ / month?"

4. "If I could show you how to get to $_____ / month working _____ hours per week within _____ months/years, you'd be ready to get started, wouldn't you?"

      c.      In one video posted to Facebook, Jay Noland called SBH a "literal golden goose . . . a perpetual money and health machine."

47.      Notwithstanding the claims described above, Defendants also tell SBH Affiliates to avoid making "income claims" by instead referring to "lifestyle enhancements."

      a.      SBH's "Getting Started Training" presentation deck tells Affiliates, "No Income Claims (Share Lifestyle Enhancements Instead)."

      b.      Similarly, SBH's "1-10 Overview," which Affiliates use to recruit consumers, includes a "Lifestyle" section picturing a luxury car and highlighting "exotic reward trips and vacations" and "luxury and living incentives."

      c.      On one company conference call, Harris told Affiliates: "Don't make income claims. Say things like, 'I've been able to make my car payment or my house payment with the income we're making on the side.' . . . Say things like, 'My wife was able to walk away from her job . . . or both of us were able to walk away from our jobs based on the residual income from the company.'"

d.    In a video posted to Facebook, Jay Noland claimed that his past trainees, by listening to his advice, had acquired "Lamborghinis; Rolls Royces; Bentleys; multimillion-dollar homes in single-, double-, and triple-gated communities; [and] Bahamas trips."

e.    On another Facebook video, Jay Noland described the success obtained by adherents to his system: "You see their million-dollar homes they're buying.  You see the Lamborghinis, you see the Ferraris.  You see all these great things that people are able to obtain, the travel, how they're able to help their family out, help their favorite nonprofit cause.  All of a sudden, you see them going in, donating $100,000, $200,000, man."

48.    Jay Noland has described this "lifestyle enhancement" marketing strategy as an effort to avoid government scrutiny.  He explained that "instead of telling people how much [money] we make, we just go, okay, last week, I made enough to buy that Maserati cash."

49.    Defendants' publicly available marketing materials feature images of luxury yachts and cars, piles of cash, and exotic vacations.  For example, one SBH promotional video states that SBH is a "recession-proof" business that could "change everything – the car you drive, the home you live in, the vacations you take, the control of your life."

50.    Defendants sometimes tell consumers that income is not "guaranteed," that "results may vary," and that any explanations of the SBH commission plan that show lucrative results are "simple theoretical examples."

51.     These income-related disclaimers frequently are inconspicuously disclosed in fine print on SBH's promotional materials.

52.     Defendants also regularly undermine these disclaimers, including by making the claims described in paragraphs 38-49 above.

      a.     On one SBH conference call, Jay Noland explained that Defendants' "theoretical examples" of lucrative income are only "theoretical" because "you haven't done it yet."

      b.     Similarly, in a publicly available presentation, Jay Noland referenced potential income of $23,500 per month as a "simple theoretical example." He then asked, "Why is it theoretical?" and answered himself, "Because you just ain't done it yet. But are there people that do it? . . . Yes. I got people in my network globally that make that look silly."

53.     On many occasions, Defendants explain that the only things separating SBH Affiliates from substantial income and millionaire status is work ethic, attitude, and a willingness to follow Defendants' instructions.

      a.     In an SBH conference call announcing changes to the company's commission plan, Jay Noland told Affiliates, "The money opportunities to make and change your life [are] ridiculous. All you've got to do is go to work."

      b.     Jay Noland told Affiliates this his plan was "literally dummy-proof. . . . [They] came out with 'This for Dummies' and 'That for Dummies,' this is literally 'Direct Sales for Dummies.' A dummy can just go follow these instructions and create wealth."

c.      Sacca promised Affiliates that "there's no way you can fail if you utilize the training that Mr. Noland is going to give us at [an upcoming training event]."

d.      In one SBH recruiting presentation, just after describing a $5 million recruitment incentive, Defendants suggest that anyone can succeed:



54.     Defendants direct SBH Affiliates to tell recruits that the company's rewards are "achievable for the masses."

55.     Defendants' claims described in paragraphs 39-54 are false.

56.     SBH does not offer consumers a viable path to "financial freedom" or to replacing their job income in six months.

57.     Typically, SBH Affiliates pay more money to the company than they receive from it.

58.     SBH does not even abide by its own commission plan when compensating Affiliates.  An FTC investigator used an undercover identity to enroll in SBH and then made sales and purchases that should have entitled him to commissions.  He never

received those commissions, and the company did not respond to his email inquiry regarding the missing commissions.

59.     Even if Defendants honored SBH's commission plan, the structure of that plan, and Defendants' instructions for how to take advantage of it, ensure that the vast majority of participants lose money in the program.

## SBH Operates as an Unlawful Pyramid Scheme

60.     Each version of the SBH commission plan, and the manner in which Defendants have promoted the plan, has prioritized and incentivized recruiting new Affiliates over selling SBH products to ultimate users of those products.

61.     For example, SBH promises commissions to Affiliates based only on Affiliate or non-Affiliate product *purchases* from SBH, rather than *sales to users of SBH products*.  Specifically, Affiliates receive commissions and other rewards based on the Affiliate's "personal order and any orders generated from [their SBH] website" as well as personal orders and orders generated from downline Affiliate Websites.  SBH does not separately track sales made by Affiliates to ultimate users of SBH products.

62.     The vast majority of purchases from the SBH website or from Affiliate Websites are made by Affiliates.

63.     Affiliates' purchases from the SBH website or Affiliate Websites are not motivated by actual consumer demand for the SBH products, but rather by the opportunity to pursue higher ranks within SBH.

64.     Defendants promote "Four Steps to Success" for new SBH Affiliates, as depicted in the visual below.  The Four Steps to Success—which have remained

consistent throughout all versions of the commission plan—do not mention retail sales, instead encouraging Affiliates to buy products, "build a team," and then "duplicate" their own efforts by "[t]each[ing] your team to do the same."



65. In other training materials, Defendants elaborate on the Four Steps to Success.

  a. In Step 1 ("Get Started"), Defendants urge consumers to make large up-front investments in "business packs," which cost $125, $500, or $1,995 and contain miscellaneous SBH products. Defendants tell Affiliates that starting with a more expensive pack will create "more initial commission benefits."

  b. In Step 2 ("Be a Product of the Product"), Defendants tell consumers to set up a monthly product "auto-order." To be eligible for many bonuses and rewards, Affiliates must set up a minimum $60 monthly auto-order. Defendants

also tell Affiliates and recruits that setting up an auto-order will give them an

"85% chance of earning regular commission checks within 2 years."

   c.  In Step 3 ("Build A Team"), Defendants focus Affiliates on

recruiting. They instruct Affiliates to "be sure to personally refer at least two new

Affiliates within your first 7 Days if you are aiming to Replace Your Income (No

More Job)." After the first seven days, Affiliates are encouraged to "keep building

every month," "duplicate the system," and "focus on rank advancing."

   d.  In Step 4 ("Pay Attention to the Training and Duplicate"),

Defendants tell Affiliates to use SBH-provided materials to "[t]each your team to

do the same" steps identified above. A separate SBH training document describes

"duplication" as the "key to long term success" as an SBH Affiliate.

   66.  All versions of the SBH commission plan have encouraged Affiliates to

harness the "Power of 10." An Affiliate can achieve the "Power of 10" by recruiting ten

new Affiliates as the Affiliate's "Tier 1," each of whom themselves recruit ten new

Affiliates as the original Affiliate's "Tier 2," and so on through Tiers 3-5. Therefore, in

the Power of 10, Tier 1 contains 10 Affiliates, Tier 2 contains 100 Affiliates, Tier 3

contains 1,000 Affiliates, Tier 4 contains 10,000 Affiliates, and Tier 5 contains 100,000

Affiliates, for a cumulative total of 111,110 Affiliates.

   67.  Defendants promote an example of the Power of 10 wherein each of the top

Affiliate's 111,110 downline Affiliates generate purchases from SBH of $500 per month,

for a cumulative monthly purchase volume of over $55 million. Defendants use the

following visual to highlight that the top Affiliate receives a $1,173,500 monthly

commission in this example:



68.     Defendants also promote an otherwise-identical example wherein each of

the 111,110 downline Affiliates generate $100 rather than $500 in product purchases per

month, which results in a $234,700 monthly commission for the top Affiliate.

69.     Defendants further push the Power of 10 by promoting a "BAM Bonus"

that pays out $1 million to an Affiliate who completes the Power of 10 with all 111,110

downline Affiliates generating $100 in monthly purchases, and $5 million to an Affiliate

who completes the Power of 10 with all 111,110 downline Affiliates generating $500 in

monthly purchases.

70.     In fact, as of April 2019, not a single SBH Affiliate had even completed Tier 2 of the Power of 10 at the $100-per-month level, much less all five tiers at the $500-per-month level.

71.     For a single Affiliate to achieve the five-tier "Power of 10," at least 100,000 of that Affiliate's downline team members must lose money.

72.     Defendants frequently emphasize that the path to millionaire status and financial freedom depends on recruiting ten Affiliates and then starting the "duplication" process.

    a.     A public SBH presentation that includes the following visual directs Affiliates to "get 'my 10' Affiliate Team Members" and to "teach[] each new Team Member to the same thing, get 'their 10.'"



    b.     On one SBH Affiliate conference call, Harris told SBH Affiliates "your ten-by-ten is the most important thing you can ever build in this company.

The most important thing you can do is think about it every day. I've got to get my ten, my ten on my first tier."

        c.      In another Facebook video, Sacca told Affiliates that the SBH commission plan is "driven 100%" by the Power of 10 BAM Bonus. Jay Noland called this training session the best training he ever saw Sacca do.

73.      Defendants also encourage Affiliates to buy large amounts of products when they sign up, and to continue stockpiling inventory thereafter. They encourage these purchases not as a response to consumer demand, but instead as a strategy of growing one's business and advancing to higher SBH ranks.

        a.      The SBH Fast Start system, for example, states, "The more inventory you have to start your business, the faster your business typically will grow."

        b.      Harris coached Affiliates to "make sure we keep our shelves full."

        c.      With just hours remaining in one monthly sales period, Jay Noland pushed any Affiliate with $500 in monthly sales over the prior 30 days to make an additional $14,500 in purchases in the final four hours, which would qualify the Affiliate for SBA1 status for the following month. Noland added: "You can do it. It's just in your mind . . . . Listen to me. You can go in, order you a case."

        d.      Similarly, Harris told Affiliates at the end of another monthly sales period to buy products to achieve Business Affiliate status. He acknowledged receiving complaints from Affiliates who already had $1,000 in unsold merchandise in their house, but dismissed those concerns by explaining that this

unsold inventory was actually a benefit: "If you got $1,000 [in products] in your house, congratulations. If you got 4 or $5,000 worth, congratulations. If you got more than that, congratulations. Mr. Noland and I used to carry around 10, 15, 20, $25,000 or more in products."

74.     Defendants press Affiliates to take financial risks to attend trainings and buy SBH products. In particular, Defendants encourage recruits to max out credit cards, borrow from family, take loans from banks, and sell or mortgage their homes to fund their SBH businesses.

75.     In one Facebook video, Harris recounted telling an Affiliate that he should obtain a loan to travel to Orlando for an SBH training event: "So it's not worth getting a loan to come here and build something that's going to take care of your family for generations? Right, I mean, yeah, I would get a loan if I needed one. Guess what I did back in the 1990s [in a prior multilevel marketing program]? I got loans. . . . I got [my credit cards] increased to the point where I couldn't even use them no more . . . . I borrowed money from people in my family and from some of my friends."

76.     While urging Affiliates to build large inventories of products in order to improve their SBH ranks—and therefore increase their commissions and other rewards—Defendants simultaneously undercut Affiliates' ability to sell that inventory at any meaningful profit.

77.     Specifically, Defendants sell products to Affiliates at what they call "wholesale" price.

78.    Defendants then state that Affiliates should apply at least a 50% "markup" to products in the Affiliate's personal inventory before selling the products in hand-to-hand sales at a "retail" price.  Affiliates earn no commission on those in-person sales, but can make money by selling at a higher price than their wholesale purchase price.

79.    Defendants, however, compete with their own Affiliates by making the Affiliate "wholesale" price available to the general public.  Thus, both Affiliates and non-Affiliates can purchase products at the exact same "wholesale" price from the SBH website or Affiliate Websites.

80.    As a result, non-Affiliate consumers have little reason to pay the 50% retail "markup" at which SBH suggests Affiliates sell their products, and Affiliates struggle to sell products from their rapidly growing inventory for any meaningful profit.

81.    Defendants actually encourage Affiliates to tell their own customers that they can buy products cheaper directly from SBH.  SBH's retail script directs Affiliates to tell customers, "I need you to help me out by buying at least a bag or two of coffee from me one time at Retail Pricing.  If you like it, I will show you how to get it at Wholesale Pricing from then on."

82.    Defendants also expressly tell Affiliates that their top priority is recruiting rather than retail sales.

a.    In describing one "cash promotion," Jay Noland declared that the goal was "to get you focused on what you should be focusing on right now, which is new people getting into the company."  Noland then reminded Affiliates to "get[] ten to get ten to get ten."

b.     SBH's director of sales told Affiliates that retail sales were a "great way to make some extra, part-time money, to make some quick quick money," but emphasized that "recruiting is key" and that Affiliates should spend their time building a "10x10x10x10x10."

c.     Similarly, one top SBH Affiliate said she would "gloss over retail" at a recruiting event in order to spend more time on the purported lucrative benefits of recruiting.

83.    Defendants' "One Year Commitment Form" for new Affiliates requires Affiliates to make ten commitments, none of which involve selling products to non-Affiliate consumers.



**I hereby commit that I will:**

• Give 110% to my SBH Business.
• Be a Product of the SBH Products.
• Launch my Business by hosting at least 4 SBH Business Mixers within my first 30 days.
• Expose my SBH business to at least 2 people per day (5 days per week).
• Make sure my team goes through the SBH "Fast Start System" Training.
• Host or Attend at least 1 SBH Business Mixer (CTM) per week for the next year.
• Attend all Major Corporate Events (typically 2 or 3 per year).
• Attend all local weekly "Getting Started Trainings" and "Regional Events" in my area.
• Practice at least 30 minutes of Self Development Daily. Commit to "Conquer Myself" and control my destiny.
• Be an Honorable Person that KEEPS MY WORD.

_____

**I WILL CONDUCT MY BUSINESS BY THESE CORE PRINCIPLES AND
I FURTHER COMMIT THAT I WILL BE HERE 1 YEAR FROM NOW!**

84.    Jay Noland has urged Affiliates to continue recruiting even when products are unavailable due to shipping delays, explaining that Affiliates should "sell the vision" instead of the products, and adding that "the bigger vision you sell, the bigger paycheck you get."

85.     Jay Noland also has admitted that the products, and consumer demand for

the products, are unimportant to his ability to sell consumers on the promise of financial

freedom.  Noland stated that "you can plug any company or product into this process, and

you can be free financially if you want to be."

**Defendants' Shipping Delays and Punitive Chargeback and Refund Policies**

86.     Defendants sell products to consumers, including Affiliates, through the

SBH website and Affiliate Websites.

87.     Defendants also sell products to Affiliates through the Affiliate's "back

office"—a password-protected website managed by SBH and unique to each Affiliate.

88.     Defendants do not clearly and conspicuously disclose a shipping date to

consumers who purchase products on the SBH website, Affiliate Websites, or Affiliate

back offices.

89.     During the product-ordering process on the SBH website or Affiliate

Websites, Defendants do not display the SBH "terms and conditions."  Instead,

consumers can only find the terms and conditions by clicking on a small-print "Terms of

Use" hyperlink on the bottom of the SBH website or Affiliate Websites.

90.     When Affiliates order products from their back offices, they can only view

the terms and conditions by clicking a hyperlink.

91.     Buried within Defendants' undisclosed or hyperlinked terms and

conditions, and spread across multiple, sometimes-unnumbered sections in small font, are

the specifics of SBH's shipping, no-refund, and chargeback policies.

a. In the second paragraph of section 14, Defendants state that "SBH [p]roducts typically ship within 48 business hours" and that "from time to time," products may not ship for "up to 60 days or more in some cases."

b. Section 14 also states that all product purchases are nonrefundable "for any reason whatsoever" and prohibits consumers from seeking credit card "chargebacks" (i.e., a refund through a credit card company).

c. The unnumbered "Liquidated Damages" section of the terms and conditions impose liquidated damages upon consumers who "violate[] the No Refund Policy and file[] a chargeback or dispute[] a purchase they made from [SBH]." Those damages equal three times the amount of each chargeback or $1,000—whichever is greater.

d. The unnumbered "Confession of Judgment" section of the terms and conditions also allows SBH to confess a judgment in any court against a consumer who "dispute[s]" a credit card payment or obtains a reversal of a credit card transaction "for any reason." The same section defines the confessed judgment amount as three times the amount of each reversed or disputed charge or $1,000— whichever is greater—plus the amount of the original charge, along with collection costs, court costs, and attorneys' fees.

92. In a separate part of the SBH Affiliates' back offices, a "frequently asked questions" section responds to a "What is the SBH Shipping policy?" question by stating that products "typically ship within 48 – 72 business hours from when the order is

placed." Only under a separate "How do refunds work?" question do Defendants state that orders may not ship for "up to 60 days or more in some cases."

93.   On many occasions, consumers have waited months to receive products or have not received products at all.

94.   Defendants do not obtain consumers' consent to shipping delays.

95.   Defendants do not offer any consumers, including consumers who wait for months to receive products or who never receive their products, the option to cancel their order and obtain a refund.

96.   Defendants do not provide refunds to consumers who request them, including consumers who wait months to receive their products or who never receive their products.

97.   Jay Noland has urged Affiliates to "keep ordering, keep moving, keep pushing," even when SBH runs out of products.

98.   Defendants threaten consumers who ask questions or complain about shipping delays with legal action or removal from the company.

99.   In one Facebook video, Jay Noland said, "We're having just a crazy amount of people calling our 800 number asking where their orders are at." He blamed this on "terrible leadership" not by himself, but instead by the Affiliates who had recruited the complaining Affiliates. He then threatened to remove from SBH the complaining Affiliates and those Affiliates' upline referrers.

100.    In one video posted to Facebook, Jay Noland threatened to report to the police any Affiliate who requested a chargeback on a product for which he or she had received a commission—even if the Affiliate had not received the product.

101.    SBM Holdings sued nine SBH Affiliates in Nevada state court, alleging, among other things, that the Affiliates violated the SBH terms and conditions by seeking at least 12 chargebacks.

### Defendants' Sale of Consumers Goods and Services at SBH and Success by Media Events

102.    Defendants and their representatives frequently host events at which they sell SBH products and tickets to future training events.  These events occur at locations other than the Defendants' place of business.

103.    As seen in the image accompanying paragraph 83, Defendants require new Affiliates to attend all "major corporate events."  Similarly, as described in paragraph 44, Defendants encourage Affiliates seeking financial freedom to attend "all SBH Corporate trainings and events no matter what."

104.    The "major corporate events" referenced in paragraph 103 occur 3-4 times annually at a cost $200-3500 per ticket, excluding travel and hotel costs.  These events usually occur in hotel conference rooms or convention centers.

105.    Defendants and their representatives also host smaller events, such as "coffee tea mixers" ("CTMs") or "Success Saturdays," throughout the year.  These events usually occur in Defendants' or their representatives' homes or in hotel conference rooms.

106.   At these events, Defendants use high-pressure tactics—including threats of diminished status within SBH; emotional pleas from friends, family, and SBH leaders; and screaming—to sell consumer goods or services, including SBH products and tickets to training events, that cost more than $130.

107.   Defendants do not inform, either orally or in writing, purchasers of goods or services at the above-described events of their right to cancel the transaction within three business days.  Defendants also do not provide these purchasers with a form "notice of cancellation" that they may use to cancel the transactions.

108.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

109.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

110.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I – Illegal Pyramid

111.   As alleged above, Defendants operate or promote participation in an unlawful scheme in which participants pay money to the company in return for which they receive (1) the right to sell products, and (2) in return for recruiting other participants into the program, the right to receive rewards that are unrelated to the sale of products to ultimate users.

112.   Defendants' operation or promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II – Income Misrepresentations

113.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate, or further participate, in the SBH program, Defendants have represented, directly or indirectly, expressly or by implication, that SBH Affiliates are likely to earn substantial income.

114.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in paragraph 113, SBH Affiliates are not likely to earn substantial income.

115.   Therefore, Defendants' practices, as set forth in paragraph 113, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III – Means and Instrumentalities

116.   By furnishing SBH Affiliates with promotional materials and instructions to be used in recruiting new participants that contain false or misleading representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

117.   Therefore, Defendants' practices, as set forth in paragraph 116, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE MAIL, INTERNET, OR
## TELEPHONE ORDER MERCHANDISE RULE

118.    The Merchandise Rule, 16 C.F.R. Part 435, prohibits sellers from soliciting

any order for the sale of merchandise ordered through the mail, via Internet or by

telephone "unless at the time of the solicitation, the seller has a reasonable basis to expect

that it will be able to ship any ordered merchandise to the buyer" either "[w]ithin that

time clearly and conspicuously stated in any such solicitation; or [i]f no time is clearly

and conspicuously stated, within 30 days after receipt of a properly completed order from

the buyer." 16 C.F.R. § 435.2(a)(1).

119.    "Receipt of a properly completed order" means "where the buyer tenders

full or partial payment . . . the time at which the seller receives both said payment and an

order from the buyer containing all of the information needed by the seller to process and

ship the order." 16 C.F.R. § 435.1(c).

120.    Where a seller is unable to ship merchandise within the seller's advertised

time or within 30 days, if no time is given, the seller must offer to the buyer "clearly and

conspicuously and without prior demand, an option either to consent to a delay in

shipping or to cancel the buyer's order and receive a prompt refund." 16 C.F.R.

§ 435.2(b)(1).

   a.    Any such offer "shall be made within a reasonable time after the

   seller first becomes aware of its inability to ship." 16 C.F.R. § 435.2(b)(1).

   b.    The offer must fully inform the buyer of the buyer's right to cancel

   and provide a definite revised shipping date or inform the buyer that the seller

cannot make any representation regarding the length of the delay.  16 C.F.R. §

435.2(b)(1)(i).

121.    A seller must "deem an order canceled and . . . make a prompt refund to the

buyer whenever the seller receives, prior to the time of shipment, notification from the

buyer cancelling the order pursuant to any option [under the Merchandise Rule] . . . [or]

[t]he seller fails to offer the option [to consent to a delay or cancel required by

§ 435.2(b)(1)] and has not shipped the merchandise" within the time required by the

Merchandise Rule.  16 C.F.R. § 435.2(c), (c)(1), (c)(5).

122.    Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16

C.F.R. § 435.2, a violation of the Merchandise Rule constitutes an unfair or deceptive act

or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15

U.S.C. § 45(a).

## Count IV – Failure to Seek Consent or Offer Cancellation

123.    In numerous instances, when Defendants failed to ship orders within the

timeframe required by the Merchandise Rule, they failed to offer customers the

opportunity to consent to a delay in shipping or to cancel their order.

124.    Defendants' practices as alleged in paragraph 123 violate the Merchandise

Rule, 16 C.F.R. § 435.2(b), and therefore are unfair or deceptive acts or practices in

violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## Count V – Failure to Provide Cancellation or Refund

125.    In numerous instances, when Defendants failed to ship orders within the

timeframe required by the Merchandise Rule and failed to offer consumers the

opportunity to consent to a delay in shipping or to cancel their order, they did not cancel

those orders or provide consumers a refund. In addition, if buyers notified Defendants of

an order cancellation pursuant to any option under the Merchandise Rule, Defendants did

not deem those orders cancelled or provide a prompt refund.

126.    Defendants' practices as alleged in paragraph 125 violate the Merchandise

Rule, 16 C.F.R. § 435.2(c), and therefore are unfair or deceptive acts or practices in

violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## VIOLATIONS OF THE RULE CONCERNING COOLING-OFF PERIODS FOR SALES MADE AT HOME OR CERTAIN OTHER LOCATIONS

127.    The Cooling-Off Rule, 16 C.F.R. Part 429, gives purchasers of certain

goods and services three days to cancel purchases of $25 or more when the sale takes

place at the purchaser's home, or $130 or more when the sale takes place at any location

other than the seller's place of business (e.g., hotel rooms or convention centers). 16

C.F.R. §§ 429.0(a), 429.1.

128.    The Cooling-Off Rule requires the seller to furnish the purchaser with a

fully completed receipt or copy of any contract pertaining to such sale at the time of its

execution, which must contain a statement summarizing the purchaser's right to cancel

within three business days. 16 C.F.R. § 429.1(a).

129.    The Cooling-Off Rule also requires the seller to inform purchasers about

cancellation rights at the time of the sale by giving the purchaser two copies of a

cancellation form (one to keep and one to send). The Cooling-Off Rule also requires the

cancellation form to be captioned either "NOTICE OF RIGHT TO CANCEL" or

"NOTICE OF CANCELLATION" and sets forth the language that must be contained in the cancellation notice. 16 C.F.R. § 429.1(b), (c).

130.    The Cooling-Off Rule also requires that, at the time the purchaser signs the contract or purchases the goods or services, the seller orally inform the purchaser of the purchaser's right to cancel. 16 C.F.R. § 429.1(e).

131.    Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16 C.F.R. § 429.1, a violation of the Cooling-Off Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VI – Failure to Notify Consumers of Cancellation Rights

132.    Defendants are "sellers" as that term is defined in Section 429.0(c) of the Cooling-Off Rule, and have been engaged in "door-to-door sales" of "consumer goods and services," as those terms are defined in Section 429.0(a), (b) of the Cooling-Off Rule.

133.    In numerous instances, in connection with the door-to-door sales of SBH products and training events, Defendants have:

      a.    Failed to furnish purchasers with a receipt or contract informing them of their right to cancel the transaction within three business days;

      b.    Failed to furnish purchasers with a "Notice of Cancellation" or "Notice of Right to Cancel" that purchasers can use to cancel the transaction; and

      c.    Failed to orally inform purchasers of their right to cancel the transaction.

134. Defendants' practices as alleged in paragraph 133 violate the Cooling-Off Rule, 16 C.F.R. § 435.1, and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## CONSUMER INJURY

135. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

136. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

137. Section 19 of the FTC Act, 15 U.S.C. § 57b, the Merchandise Rule, and the Cooling-Off Rule authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Merchandise

Rule and the Cooling-Off Rule, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the Merchandise Rule, the Cooling-Off Rule, and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, and an order providing for immediate access, the turnover of business records, an asset freeze, and the appointment of a receiver;

B.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  January 8, 2020

_____
EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Ave. NW
Mailstop CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov
(202) 326-2726; jware1@ftc.gov
(202) 326-3197 (Fax)
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# EXHIBIT B

1    **WO**

2

3

4

5

6             **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9    Federal Trade Commission,           No. CV-20-00047-PHX-DWL

10             Plaintiff,              **AMENDED ORDER**

11    v.                            (Under Seal)

12    James D Noland, Jr., et al.,

13             Defendants.

14

15       Plaintiff, the Federal Trade Commission, has filed a Complaint for Permanent

16 Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade

17 Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and has moved for a temporary

18 restraining order ("TRO"), asset freeze, other equitable relief, and an order to show cause

19 why a preliminary injunction should not issue against individual defendants James D.

20 Noland, Jr. ("Jay Noland"), Lina Noland ("Lina Noland"), Scott A. Harris ("Harris"), and

21 Thomas G. Sacca, Jr. ("Sacca") (collectively, the "Individual Defendants") and corporate

22 entities Success by Media Holdings Inc. and Success by Media LLC (together, the

23 "Corporate Defendants" or "Success By Media"). (Doc. 3 [complaint]; Doc. 7 [motion for

24 TRO]; Doc. 8 [supporting memorandum].)

25       As explained below, although the Court generally agrees that the FTC has met its

26 burden of establishing an entitlement to a TRO, the Court declines to issue the writ *ne exeat*

27 *republica* sought by the FTC as to James Noland. The Court also finds that the FTC has

28 not made a specific showing necessary to justify all of the relief it seeks as Sacca. The

1    motion is otherwise granted.

2                              **FINDINGS OF FACT**

3         The Court, having considered the Complaint, the *ex parte* Motion for TRO,

4    declarations, exhibits, and the memorandum filed in support thereof, and being otherwise

5    advised, finds that:

6         A.    This Court has jurisdiction over the subject matter of this case, and there is

7    good cause to believe that it will have jurisdiction over all parties hereto and that venue in

8    this district is proper.

9         B.    There is good cause to believe that Defendants have operated and promoted

10   a marketing scheme in which they are:

11              1.    Operating as an illegal pyramid scheme;

12              2.    Falsely representing that members of the Success By Health program

13                    (called "Affiliates") are likely to earn substantial income;

14              3.    Providing the means and instrumentalities for the commission of

15                    deceptive acts and practices by furnishing Affiliates with promotional

16                    materials containing false and misleading representations to be used

17                    in recruiting new participants;

18              4.    Not providing consumers with required notices about their right to

19                    cancel and obtain a refund, or providing consumers with such a refund

20                    when requested, for certain sales; and

21              5.    For products not shipped within 30 days from purchase, not providing

22                    consumers a revised shipping date and the opportunity to cancel and

23                    receive a refund, and not providing such refund when requested.

24        C.    There is good cause to believe that Defendants have engaged in and are likely

25   to engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

26   the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R.

27   Part 435; and the Rule Concerning Cooling-Off Period for Sales Made at Homes or at

28   Certain Other Locations ("Cooling-Off Rule"), 16 C.F.R. Part 429, and that Plaintiff is

1    therefore likely to prevail on the merits of this action. As demonstrated by detailed

2    evidence, including statements from consumers and Defendants' former Affiliates, sales

3    scripts, recruiting scripts and presentations, promotional videos, transcripts of Success By

4    Media events and conference calls, videos and recordings of Defendants, and expert

5    testimony, the FTC has established a likelihood of success in showing that Defendants have

6    operated an illegal pyramid scheme and made false, misleading, and deceptive

7    misrepresentations.

8         D.    There is good cause to believe that immediate and irreparable harm will result

9    from Defendants' ongoing violations of the FTC Act, the Merchandise Rule, and the

10   Cooling-Off Rule unless Defendants are restrained and enjoined by order of this Court.

11        E.    There is good cause to believe that immediate and irreparable damage to the

12   Court's ability to grant effective final relief for consumers – including monetary restitution,

13   rescission, disgorgement, or refunds – will likely occur from the sale, transfer, destruction

14   or other disposition or concealment by Defendants of their assets or records, unless

15   Defendants are immediately restrained and enjoined by order of this Court; and that, in

16   accordance with Fed. R. Civ. P. 65(b), the interests of justice require that this Order be

17   granted without prior notice to Defendants. Thus, there is good cause for relieving Plaintiff

18   of the duty to provide Defendants with prior notice of its Motion for a Temporary

19   Restraining Order.[1]

20        F.    Good cause exists for appointing a temporary receiver over the Receivership

21   Entities, freezing Defendants' assets, permitting the Plaintiff and the Receiver immediate

22   _____

[1]    With that said, and as discussed during the hearing on January 9, 2020, the Court
23   has some concern about its authority to grant a TRO in this context without providing
     notice to the restrained parties. The plain text of 15 U.S.C. § 53(b), under which the FTC
24   brings this action, states that a TRO may issue only "after notice to the defendant." That
     said, the Ninth Circuit has read two distinct provisos into the statute. *FTC v. Consumer
25   Defense, LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019). Under the second proviso, which the
     FTC utilizes here, the Ninth Circuit has stressed that district courts have the authority "to
26   grant any ancillary relief necessary to accomplish complete justice because [§ 53(b)] did
     not limit that traditional equitable power." *FTC v. H. N. Singer, Inc.* 668 F.2d 1107, 1113
27   (1982). Although *Singer* and *Consumer Defense* did not specifically address whether these
     broad equitable powers include the ability to issue a no-notice TRO at the FTC's request—
28   and although the second proviso of § 53(b) only mentions permanent injunctions, not
     TROs—the Court acknowledges that many other district courts faced with this question
     have granted the relief the FTC seeks.

- 3 -

1   access to the Defendants' business premises, and permitting the Plaintiff and the

2   Temporary Receiver to take expedited discovery.

3        G.    Weighing the equities and considering Plaintiff's likelihood of ultimate

4   success on the merits, a temporary restraining order with an asset freeze, the appointment

5   of a temporary receiver, immediate access to business premises, expedited discovery, and

6   other equitable relief is in the public interest.  That said, the evidence produced by the FTC

7   does not justify the extraordinary relief of a writ *ne exeat republica*.

8        H.    This Court has authority to issue this Order pursuant to Section 13(b) of the

9   FTC Act, 15 U.S.C. § 53(b); Federal Rule of Civil Procedure 65; and the All Writs Act, 28

10   U.S.C. § 1651.

11        I.    No security is required of any agency of the United States for issuance of a

12   temporary restraining order. Fed. R. Civ. P. 65(c).

13   **DEFINITIONS**

14       For the purpose of this Order, the following definitions shall apply:

15        A.    "**Asset**" means any legal or equitable interest in, right to, or claim to, any

16   property, wherever located and by whomever held, whether tangible, intangible, digital, or

17   otherwise, including, but not limited to, digital currencies, virtual currencies, digital tokens,

18   and cryptocurrencies.

19        B.    "**Corporate Defendants**" means Success By Media Holdings Inc. and

20   Success By Media LLC and each of their subsidiaries, affiliates, successors, and assigns.

21        C.    "**Defendants**" means the Corporate Defendants, James D. Noland, Jr., Lina

22   Noland, Scott A. Harris, and Thomas G. Sacca, Jr., individually, collectively, or in any

23   combination.

24        D.    "**Document**" is synonymous in meaning and equal in scope to the usage of

25   "document" and "electronically stored information" in Federal Rule of Civil Procedure

26   34(a) and includes writings, drawings, graphs, charts, photographs, sound and video

27   recordings, images, Internet sites, web pages, websites, electronic correspondence,

28   including e-mail and instant messages, contracts, accounting data, advertisements, FTP

- 4 -

1   Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone

2   logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and

3   check registers, bank statements, appointment books, computer records, customer or sales

4   databases and any other electronically stored information, including Documents located on

5   remote servers or cloud computing systems, and other data or data compilations from

6   which information can be obtained directly or, if necessary, after translation into a

7   reasonably usable form.  A draft or non-identical copy is a separate document within the

8   meaning of the term.

9       E.    "**Electronic Data Host**" means any person or entity in the business of

10  storing, hosting, or otherwise maintaining electronically stored information.  This includes,

11  but is not limited to, any entity hosting a website or server, and any entity providing "cloud

12  based" electronic storage.

13      F.    "**Individual Defendant(s)**" means James D. Noland, Jr., Lina Noland, Scott

14  A. Harris, and Thomas G. Sacca, Jr., individually, collectively, or in any combination.

15      G.    "**Marketing Program**" includes, but is not limited to, any multilevel,

16  affiliate, or network marketing program, business opportunity, pyramid marketing scheme,

17  Ponzi scheme, or chain marketing scheme.

18      H.    "**Temporary Receiver**" means the temporary receiver appointed in Section

19  XV of this Order and any deputy receivers that shall be named by the temporary receiver.

20      I.    "**Receivership Entities**" means Corporate Defendants as well as any other

21  entity that has conducted any business related to Defendants' marketing of programs,

22  opportunities, or services offered by Success By Media, including receipt of Assets derived

23  from any activity that is the subject of the Complaint in this matter, and that the Temporary

24  Receiver determines is controlled or owned by any Defendant.

25                              **ORDER**

26              **I.    PROHIBITED BUSINESS ACTIVITIES**

27      **IT IS THEREFORE ORDERED** that Defendants, Defendants' officers, agents,

28  employees, and attorneys, and all other persons in active concert or participation with them,

1  who receive actual notice of this Order by personal service or otherwise, whether acting
2  directly or indirectly, in connection with the advertising, marketing, promoting, or offering
3  for sale of any Marketing Program, are temporarily restrained and enjoined from:

4      A.    Engaging in, participating in, assisting others, or providing others with the
5  means and instrumentalities to engage or participate in, any Marketing Program that:

6          1.    Pays compensation for recruiting new members;

7          2.    Encourages or incentivizes members to purchase goods or services to
8              obtain or maintain eligibility for bonuses, rewards, or commissions
9              rather than for resale or personal use;

10          3.    Induces others to encourage or incentivize members to purchase
11              goods or services to obtain or maintain eligibility for bonuses,
12              rewards, or commissions rather than for resale or personal use;

13          4.    Pays any compensation related to the purchase or sale of goods or
14              services unless such compensation is for sales to or purchases by
15              persons who are not members of the Marketing Program and who
16              were not being recruited to become members of the Marketing
17              Program;

18          5.    Fails to monitor and take all reasonable steps necessary to ensure that
19              any compensation paid is for sales to or purchases by persons who are
20              not members of the Marketing Program and who were not being
21              recruited to become members of the Marketing Program; or

22          6.    Constitutes a pyramid scheme or chain marketing scheme.

23      B.    Misrepresenting, or assisting others in misrepresenting, directly or indirectly,
24  expressly or by implication, any material fact, including, but not limited to, that consumers
25  who participate in a Marketing Program will receive or are likely to receive substantial
26  income, as well as any other fact material to consumers concerning any good or service,
27  such as: the total costs; any material restrictions, limitations, or conditions; or any material
28  aspect of its performance, efficacy, nature, or central characteristics.

- 6 -

1      C.     For any sale for $25 or more made at the residence of the buyer, or of $130

2 or more for sales made at a location other than Defendants' place of business, failing (1) to

3 inform any consumer, orally and in writing in a bold, size 10-point font, of the consumer's

4 right to cancel the purchase without penalty within 3 business days and obtain a full refund;

5 and (2) failing to provide such refund within 10 business days of request.

6      D.     Failing, with respect to any merchandise sold by Defendants by mail, via the

7 Internet, or by telephone that is not shipped within 30 days or within any other time that is

8 clearly and conspicuously displayed at the time of purchase, to offer the buyer the option

9 to cancel the order and receive a full refund or to consent to a delay; and failing to provide

10 consumers a refund when requested under those conditions.

11    **II.    PROHIBITION ON RELEASE OF CUSTOMER INFORMATION**

12      **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents,

13 employees, and attorneys, and all other persons in active concert or participation with any

14 of them, who receive actual notice of this Order, whether acting directly or indirectly, are

15 hereby temporarily restrained and enjoined from:

16      A.     Selling, renting, leasing, transferring, or otherwise disclosing, the name,

17 address, birth date, telephone number, email address, credit card number, bank account

18 number, Social Security number, or other financial or identifying information of any person

19 that any Defendant obtained in connection with any activity that pertains to the subject

20 matter of this Order; and

21      B.     Benefitting from or using the name, address, birth date, telephone number,

22 email address, credit card number, bank account number, Social Security number, or other

23 financial or identifying information of any person that any Defendant obtained in

24 connection with any activity that pertains to the subject matter of this Order.

25      Provided, however, that Defendants may disclose such identifying information to a

26 law enforcement agency, to their attorneys as required for their defense, as required by any

27 law, regulation, or court order, or in any filings, pleadings, or discovery in this action in

28

1 | the manner required by the Federal Rules of Civil Procedure and by any protective order

2 | in the case.

### III.   ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.   Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets that are:

1.   owned or controlled, directly or indirectly, by any Defendant;

2.   held, in part or in whole, for the benefit of any Defendant;

3.   in the actual or constructive possession of any Defendant; or

4.   owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant;

B.   Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled or leased in the name of any Defendant, or subject to access by any Defendant, except as necessary to comply with written requests from the Temporary Receiver acting pursuant to its authority under this Order;

C.   Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager. This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signor; or

1         D.     Cashing any checks or depositing any money orders or cash received from

2 consumers, clients, or customers of any Defendant.

3        The Assets affected by this Section shall include: (1) all Assets of Defendants as of

4 the time this Order is entered; and (2) Assets obtained by Defendants after this Order is

5 entered if those Assets are derived from any activity that is the subject of the Complaint in

6 this matter or that is prohibited by this Order. This Section does not prohibit any transfers

7 to the Temporary Receiver or repatriation of foreign Assets specifically required by this

8 Order or expenditures by the Individual Defendants for minor, day-to-day living expenses.

9       **IV.    DUTIES OF ASSET HOLDERS AND OTHER THIRD PARTIES**

10       **IT IS FURTHER ORDERED** that any financial or brokerage institution,

11 Electronic Data Host, credit card processor, payment processor, merchant bank, acquiring

12 bank, independent sales organization, third party processor, payment gateway, insurance

13 company, business entity, or person who receives actual notice of this Order (by service or

14 otherwise) that:

15         (a)     has held, controlled, or maintained custody, through an account or otherwise,

16 of any Document on behalf of any Defendant or any Asset that has been owned or

17 controlled, directly or indirectly, by any Defendant; held, in part or in whole, for the benefit

18 of any Defendant; in the actual or constructive possession of any Defendant; or owned or

19 controlled by, in the actual or constructive possession of, or otherwise held for the benefit

20 of, any corporation, partnership, asset protection trust, or other entity that is directly or

21 indirectly owned, managed or controlled by any Defendant;

22         (b)     has held, controlled, or maintained custody, through an account or otherwise,

23 of any Document or Asset associated with credits, debits, or charges made on behalf of any

24 Defendant, including reserve funds held by payment processors, credit card processors,

25 merchant banks, acquiring banks, independent sales organizations, third party processors,

26 payment gateways, insurance companies, or other entities; or

27         (c)     has extended credit to any Defendant, including through a credit card

28 account, shall:

A.   Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such Document or Asset, as well as all Documents or other property related to such Assets, except by further order of this Court; provided, however, that this provision does not prohibit an Individual Defendant from incurring charges on a personal credit card established prior to entry of this Order, up to the pre-existing credit limit;

B.   Deny any person, except the Temporary Receiver, access to any safe deposit box, commercial mail box, or storage facility that is titled in the name of any Defendant, either individually or jointly, or otherwise subject to access by any Defendant;

C.   Provide Plaintiff's counsel and the Temporary Receiver, within 3 days of receiving a copy of this Order, a sworn statement setting forth, for each Asset or account covered by this Section:

1.   The identification number of each such account or Asset;

2.   The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other Asset was remitted; and

3.   The identification of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any Defendant; and

D.   Upon the request of Plaintiff's counsel or the Temporary Receiver, promptly provide Plaintiff's counsel and the Temporary Receiver with copies of all records or other Documents pertaining to any account covered by this Section or Asset, including originals or copies of account applications, account statements, signature cards, checks, drafts,

- 10 -

deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mail boxes, and storage facilities.

Provided, however, that this Section does not prohibit any transfers to the Temporary Receiver or repatriation of foreign Assets specifically required by this order.

## V.    FINANCIAL DISCLOSURES

**IT IS FURTHER ORDERED** that the Corporate Defendants, James D. Noland, Jr., Lina Noland, and Scott A. Harris, within 5 days of service of this Order, shall prepare and deliver to Plaintiff's counsel and the Temporary Receiver:

A.    completed financial statements on the forms attached to this Order as **Attachment A** (Financial Statement of Individual Defendant) for each Individual Defendant, and **Attachment B** (Financial Statement of Corporate Defendant) for each Corporate Defendant; and

B.    completed **Attachment C** (IRS Form 4506, Request for Copy of a Tax Return) for each Individual and Corporate Defendant.[2]

## VI.    FOREIGN ASSET REPATRIATION

**IT IS FURTHER ORDERED** that within 5 days following the service of this Order, the Corporate Defendants, James D. Noland, Jr., Lina Noland, and Scott A. Harris shall:

A.    Provide Plaintiff's counsel and the Temporary Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, Documents, and accounts outside of the United States which are:  (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of

---

[2]    The obligations in Sections V and VI do not apply to Thomas G. Sacca, Jr. Although the FTC has provided evidence of the immediate need to identify further assets held by the other Individual Defendants, the same showing has not been made as to Sacca. It is a significant step to require an individual who has not been found guilty of any crime, not been found liable for any civil wrongdoing, and not yet had a chance to be heard to disclose his financial and tax history to the FTC. Thus, Sacca is not required to make the financial disclosures discussed in Section V and VI at this early juncture of the case.

1     any Defendant or for the benefit of any corporation, partnership, asset protection trust, or

2     other entity that is directly or indirectly owned, managed or controlled by any Defendant;

3     or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

4          B.     Take all steps necessary to provide Plaintiff's counsel and Temporary

5     Receiver access to all Documents and records that may be held by third parties located

6     outside of the territorial United States of America, including signing the Consent to Release

7     of Financial Records appended to this Order as **Attachment D**.

8          C.     Transfer to the territory of the United States all Documents and Assets

9     located in foreign countries which are: (1) titled in the name, individually or jointly, of any

10     Defendant; (2) held by any person or entity for the benefit of any Defendant or for the

11     benefit of any corporation, partnership, asset protection trust, or other entity that is directly

12     or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or

13     indirect control, whether jointly or singly, of any Defendant; and

14          D.     The same business day as any repatriation, (1) notify the Temporary Receiver

15     and counsel for Plaintiff of the name and location of the financial institution or other entity

16     that is the recipient of such Documents or Assets; and (2) serve this Order on any such

17     financial institution or other entity.

18                **VII.  NON-INTERFERENCE WITH REPATRIATION**

19          **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents,

20     employees, and attorneys, and all other persons in active concert or participation with any

21     of them, who receive actual notice of this Order, whether acting directly or indirectly, are

22     hereby temporarily restrained and enjoined from taking any action, directly or indirectly,

23     which may result in the encumbrance or dissipation of foreign Assets, or in the hindrance

24     of the repatriation required by this Order, including, but not limited to:

25          A.     Sending any communication or engaging in any other act, directly or

26     indirectly, that results in a determination by a foreign trustee or other entity that a "duress"

27     event has occurred under the terms of a foreign trust agreement until such time that all

28     Defendants' Assets have been fully repatriated pursuant to this Order; or

1       B.     Notifying any trustee, protector or other agent of any foreign trust or other

2 related entities of either the existence of this Order, or of the fact that repatriation is

3 required pursuant to a court order, until such time that all Defendants' Assets have been

4 fully repatriated pursuant to this Order.

5                 **VIII.  CONSUMER CREDIT REPORTS**

6       **IT IS FURTHER ORDERED** that Plaintiff may obtain credit reports concerning

7 any Defendants pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C.

8 1681b(a)(1), and that, upon written request, any credit reporting agency from which such

9 reports are requested shall provide them to Plaintiff.

10               **IX.  PRESERVATION OF RECORDS**

11       **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents,

12 employees, and attorneys, and all other persons in active concert or participation with any

13 of them, who receive actual notice of this Order, whether acting directly or indirectly, are

14 hereby temporarily restrained and enjoined from:

15       A.     Destroying, erasing, falsifying, writing over, mutilating, concealing, altering,

16 transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents

17 that relate to:  (1) the business, business practices, Assets, or business or personal finances

18 of any Defendant; (2) the business practices or finances of entities directly or indirectly

19 under the control of any Defendant; or (3) the business practices or finances of entities

20 directly or indirectly under common control with any other Defendant; and

21       B.     Failing to create and maintain Documents that, in reasonable detail,

22 accurately, fairly, and completely reflect Defendants' incomes, disbursements,

23 transactions, and use of Defendants' Assets.

24       **X.  PRESERVATION OF RECORDS BY THIRD PARTIES**

25       **IT IS FURTHER ORDERED** that any person who receives actual notice of this

26 Order (by service or otherwise) that has held, controlled, or maintained custody of any

27 Document on behalf of any Defendant that relates to the business or business practices of

28 any Defendant or of any directly or indirectly under the control of any Defendant  are

1 | hereby restrained and enjoined from destroying, erasing, falsifying, writing over,

2 | mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner,

3 | directly or indirectly, any such Documents.

## XI. REPORT OF NEW BUSINESS ACTIVITY

5 | **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents,

6 | employees, and attorneys, and all other persons in active concert or participation with any

7 | of them, who receive actual notice of this Order, whether acting directly or indirectly, are

8 | hereby temporarily restrained and enjoined from creating, operating, or exercising any

9 | control over any business entity, whether newly formed or previously inactive, including

10 | any partnership, limited partnership, joint venture, sole proprietorship, or corporation,

11 | without first providing Plaintiff's counsel and the Receiver with a written statement

12 | disclosing: (1) the name of the business entity; (2) the address and telephone number of

13 | the business entity; (3) the names of the business entity's officers, directors, principals,

14 | managers, and employees; and (4) a detailed description of the business entity's intended

15 | activities.

## XII. INTERNATIONAL TRAVEL RESTRICTIONS AND SURRENDER OF PASSPORTS—WRIT *NE EXEAT*

18 | **IT IS FURTHER ORDERED** that the FTC's motion for a writ *ne exeat republica*

19 | as to James D. Noland is **denied**. As an initial matter, it is unclear whether such a writ is

20 | available in this circumstance. The great majority of cases, including the jurisprudential

21 | underpinning of the modern writ *ne exeat*, found authority to grant such a writ in 26 U.S.C.

22 | § 7402. *See, e.g.*, *United States v. Shaheen*, 445 F.2d 6, 9 n.4 (7th Cir. 1971). Title 26 is

23 | the tax code—no analogue to § 7402 exists in Title 15, under which the FTC brings this

24 | action. Although counsel for the FTC indicated the All Writs Act, 28 U.S.C. § 1651,

25 | provides a basis for the requested writ in this case, the Court has not found any authority

26 | relying on the All Writs Act to issue such a writ. *Shaheen* itself does not cite the All Writs

27 | Act but relies entirely on § 7402.

28

1       Moreover, even if the Court had the authority to grant a writ *ne exeat republica*, it

2   is not warranted in this case.   A writ *ne exeat republica* is "an extraordinary writ" that

3   requires a showing of "exceptional circumstances." *Shaheen*, 445 F.2d at 10. The FTC has

4   failed to show such circumstances here.   The FTC seeks this writ against James Noland

5   only.   The materials submitted by the FTC suggest that Noland left the United States

6   months ago and has been absent from the country for an extended period of time.   (Doc. 8

7   at 51.)   It is unclear how a writ designed to keep Noland in the country would be of any

8   benefit now that Noland is out of the country.   Also, although the FTC argues that the writ

9   is necessary to prevent the movement of Noland's assets out of the United States, it is

10   unclear whether the addition of the writ (which may be beyond the Court's powers) would

11   actually further this goal in light of the other (broad) relief the Court is granting.

12             **XIII.   THIRD PARTY INTERNATIONAL TRAVEL PROVIDERS**

13       **IT IS FURTHER ORDERED** that, in light of the Court's decision on the writ *ne*

14   *exeat republica*, the FTC's request to enjoin common carriers from providing international

15   travel to Noland is **denied**.   The Court also notes that, even if it had granted the writ, it is

16   not at all clear that it could practicably order common carriers to prevent Noland's travels.

17                     **XIV.   TAMPERING**

18       **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents,

19   employees, and attorneys, and all other persons in active concert or participation with any

20   of them, who receive actual notice of this Order, whether acting directly or indirectly, are

21   hereby temporarily restrained and enjoined from, in the course of this proceeding:

22        A.     Using or attempting to use force, the threat of force, or payment to influence,

23   delay, or prevent the testimony of any person;

24        B.     Causing or inducing, or attempting to cause or induce, any person to:

25               1.     withhold testimony, or withhold a Document or other object;

26               2.     alter, destroy, mutilate, or conceal any Document or other object with

27                      intent to impair the integrity or availability of the item;

28

3.    evade legal process summoning that person to appear as a witness, or
to produce Document(s) or other object(s); or

4.    be absent from an official proceeding to which that person has been
summoned by legal process.

## XV.   TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that attorney Kimberly Friday is appointed as
temporary receiver of the Receivership Entities with full powers of an equity receiver.  The
Temporary Receiver shall be solely the agent of this Court in acting as Temporary Receiver
under this Order.

## XVI.  DUTIES AND AUTHORITY OF THE TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that the Temporary Receiver is directed and
authorized to accomplish the following:

A.    Assume full control of Receivership Entities by removing, as the Temporary
Receiver deems necessary or advisable, any director, officer, independent contractor,
employee, attorney, or agent of any Receivership Entity from control of, management of,
or participation in, the affairs of the Receivership Entity;

B.    Take exclusive custody, control, and possession of all Assets and Documents
of, or in the possession, custody, or under the control of, any Receivership Entity, wherever
situated;

C.    Take exclusive custody, control, and possession of all Documents or Assets
associated with credits, debits, or charges made on behalf of any Receivership Entity,
wherever situated, including reserve funds held by payment processors, credit card
processors, merchant banks, acquiring banks, independent sales organizations, third party
processors, payment gateways, insurance companies, or other entities;

D.    Conserve, hold, manage, and prevent the loss of all Assets of the
Receivership Entities, and perform all acts necessary or advisable to preserve the value of
those Assets.  The Temporary Receiver shall assume control over the income and profits
therefrom and all sums of money now or hereafter due or owing to the Receivership

Entities. The Temporary Receiver shall have full power to sue for, collect, and receive, all Assets of the Receivership Entities and of other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Entities. Provided, however, that the Temporary Receiver shall not attempt to collect any amount from a consumer if the Temporary Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

E.      Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Temporary Receiver shall: divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to electronic documents held onsite or by Electronic Data Hosts, by changing usernames, passwords or other log-in credentials; take possession of all electronic Documents of the Receivership Entities stored onsite or remotely; take whatever steps necessary to preserve all such Documents; and obtain the assistance of the FTC's Digital Forensic Unit, as the FTC may provide in its discretion, for the purpose of obtaining electronic documents stored onsite or remotely.

F.      Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Temporary Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

G.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Temporary Receiver. The Temporary Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order,

- 17 -

1   except payments that the Temporary Receiver deems necessary or advisable to secure

2   Assets of the Receivership Entities, such as rental payments;

3         H.     Take all steps necessary to secure and take exclusive custody of each location

4   from which the Receivership Entities operate their businesses. Such steps may include,

5   but are not limited to, any of the following, as the Temporary Receiver deems necessary or

6   advisable: (1) securing the location by changing the locks and alarm codes and

7   disconnecting any internet access or other means of access to the computers, servers,

8   internal networks, or other records maintained at that location; and (2) requiring any

9   persons present at the location to leave the premises, to provide the Temporary Receiver

10   with proof of identification, and/or to demonstrate to the satisfaction of the Temporary

11   Receiver that such persons are not removing from the premises Documents or Assets of

12   the Receivership Entities. Law enforcement personnel, including, but not limited to, police

13   or sheriffs, may assist the Temporary Receiver in implementing these provisions in order

14   to keep the peace and maintain security. If requested by the Temporary Receiver, the

15   United States Marshal will provide appropriate and necessary assistance to the Temporary

16   Receiver to implement this Order and is authorized to use any necessary and reasonable

17   force to do so;

18         I.     Take all steps necessary to prevent the modification, destruction, or erasure

19   of any web page or website registered to and operated, in whole or in part, by any

20   Defendants, and to provide access to all such web page or websites to Plaintiff's

21   representatives, agents, and assistants, as well as Defendants and their representatives;

22         J.     Enter into and cancel contracts and purchase insurance as advisable or

23   necessary;

24         K.     Prevent the inequitable distribution of Assets and determine, adjust, and

25   protect the interests of consumers who have transacted business with the Receivership

26   Entities;

27

28

L.    Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

M.    Institute, compromise, adjust, appear in, intervene in, defend, dispose of, accept or direct service of process for, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Temporary Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Temporary Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers;

N.    Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate, in addition to obtaining other discovery as set forth in this Order;

O.    Open one or more bank accounts at designated depositories for funds of the Receivership Entities. The Temporary Receiver shall deposit all funds of the Receivership Entities in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts. The Temporary Receiver shall serve copies of monthly account statements on all parties;

P.    Maintain accurate records of all receipts and expenditures incurred as Temporary Receiver;

Q.    Allow the Plaintiffs' representatives, agents, and assistants, as well as Defendants' representatives and Defendants themselves, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business. The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents. The Temporary Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

1   R.  Allow the Plaintiffs' representatives, agents, and assistants, as well as

2 Defendants and their representatives reasonable access to all Documents in the possession,

3 custody, or control of the Receivership Entities;

4   S.  Cooperate with reasonable requests for information or assistance from any

5 state or federal civil or criminal law enforcement agency;

6   T.  Suspend business operations of the Receivership Entities if in the judgment

7 of the Temporary Receiver such operations cannot be continued legally and profitably;

8   U.  If the Temporary Receiver identifies a nonparty entity as a Receivership

9 Entity, promptly notify the entity as well as the parties, and inform the entity that it can

10 challenge the Temporary Receiver's determination by filing a motion with the Court.

11 Provided, however, that the Temporary Receiver may delay providing such notice until the

12 Temporary Receiver has established control of the nonparty entity and its assets and

13 records, if the Temporary Receiver determines that notice to the entity or the parties before

14 the Temporary Receiver establishes control over the entity may result in the destruction of

15 records, dissipation of assets, or any other obstruction of the Temporary Receiver's control

16 of the entity; and

17   V.  If in the Temporary Receiver's judgment the business operations cannot be

18 continued legally and profitably, take all steps necessary to ensure that any of the

19 Receivership Entities' web pages or websites relating to the activities alleged in the

20 Complaint cannot be accessed by the public, or are modified for consumer education and/or

21 informational purposes, and take all steps necessary to ensure that any telephone numbers

22 associated with the Receivership Entities cannot be accessed by the public, or are answered

23 solely to provide consumer education or information regarding the status of operations.

24   W.  Prepare a written report at or before any hearing described in Section XXIX,

25 that describes (1) the steps taken by the Receiver to implement the terms of the Order; (2)

26 the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps

27 the Receiver intends to take in the future to protect receivership assets, recover receivership

28 assets from third parties, and adjust receivership liabilities; (4) the Receiver's opinion on

1   whether any portion of the business of any of the Receivership Entities can continue to

2   operate legally and profitably; and (5) any other matters which the Receiver believes should

3   be brought to the Court's attention.

4   **XVII. TRANSFER OF RECEIVERSHIP PROPERTY TO THE TEMPORARY**

5   **RECEIVER**

6       **IT IS FURTHER ORDERED** that Defendants and any other person, with

7   possession, custody or control of property of, or records relating to, the Receivership

8   Entities shall, upon notice of this Order by personal service or otherwise, fully cooperate

9   with and assist the Temporary Receiver in taking and maintaining possession, custody, and

10   control of the Assets and Documents of the Receivership Entities and immediately transfer

11   or deliver to the Temporary Receiver possession, custody, and control of, the following:

12       A.    All Assets held by or for the benefit of the Receivership Entities;

13       B.    All Documents or Assets associated with credits, debits, or charges made on

14   behalf of any Receivership Entity, wherever situated, including reserve funds held by

15   payment processors, credit card processors, merchant banks, acquiring banks, independent

16   sales organizations, third party processors, payment gateways, insurance companies, or

17   other entities;

18       C.    All Documents of or pertaining to the Receivership Entities, including all

19   communications occurring via electronic mail, electronic messaging service, or

20   encrypted messaging service (including Silent Circle or WhatsApp);

21       D.    All computers, electronic devices, mobile devices, and machines used to

22   conduct the business of the Receivership Entities, even if such computers, electronic

23   devices, mobile devices, and machines are also used for non-business purposes;

24       E.    All Assets and Documents belonging to other persons or entities whose

25   interests are under the direction, possession, custody, or control of the Receivership

26   Entities; and

27       F.    All keys, codes, user names and passwords necessary to gain or to secure

28   access to any Assets or Documents of or pertaining to the Receivership Entities, including

1  access to their business premises, means of communication, accounts, computer systems

2  (onsite and remote), Electronic Data Hosts, encrypted messaging services (including Silent

3  Circle and WhatsApp), or other property.

4      In the event that any person or entity fails to deliver or transfer any Asset or

5  Document, or otherwise fails to comply with any provision of this Section, the Temporary

6  Receiver may file an Affidavit of Non-Compliance regarding the failure and a motion

7  seeking compliance or a contempt citation.

8  **XVIII.      PROVISION OF INFORMATION TO THE TEMPORARY**

9  **RECEIVER**

10      **IT IS FURTHER ORDERED** that Defendants shall immediately provide to the

11  Temporary Receiver:

12      A.      A list of all Assets and accounts of the Receivership Entities that are held in

13  any name other than the name of a Receivership Entity, or by any person or entity other

14  than a Receivership Entity;

15      B.      A list of all agents, employees, officers, attorneys, servants and those persons

16  in active concert and participation with the Receivership Entities, or who have been

17  associated or done business with the Receivership Entities; and

18      C.      A description of any documents covered by attorney-client privilege or

19  attorney work product, including files where such documents are likely to be located,

20  authors or recipients of such documents, and search terms likely to identify such electronic

21  documents.

22      **XIX.   COOPERATION WITH THE TEMPORARY RECEIVER**

23      **IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants'

24  or Receivership Entities' officers, agents, employees, and attorneys, all other persons in

25  active concert or participation with any of them, and any other person with possession,

26  custody, or control of property of or records relating to the Receivership entities who

27  receive actual notice of this Order shall fully cooperate with and assist the Temporary

28  Receiver.  This cooperation and assistance shall include, but is not limited to, providing

- 22 -

1    information to the Temporary Receiver that the Temporary Receiver deems necessary to

2    exercise the authority and discharge the responsibilities of the Temporary Receiver under

3    this Order; providing any keys, codes, user names and passwords required to access any

4    computers, electronic devices, mobile devices, and machines (onsite or remotely) and any

5    cloud account (including the specific methods to access that account) or electronic file in

6    any medium; advising all persons who owe money to any Receivership Entity that all debts

7    should be paid directly to the Temporary Receiver; and transferring funds at the Temporary

8    Receiver's direction and producing records related to the Assets and sales of the

9    Receivership Entities.

10   ## XX.   NON-INTERFERENCE WITH THE TEMPORARY RECEIVER

11   **IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants'

12   or Receivership Entities' officers, agents, employees, attorneys, and all other persons in

13   active concert or participation with any of them, who receive actual notice of this Order,

14   and any other person served with a copy of this Order, are hereby restrained and enjoined

15   from directly or indirectly:

16        A.      Interfering with the Temporary Receiver's efforts to manage, or take

17   custody, control, or possession of, the Assets or Documents subject to the receivership;

18        B.      Transacting any of the business of the Receivership Entities;

19        C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning,

20   liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession

21   or custody of, or in which an interest is held or claimed by, the Receivership Entities; or

22        D.      Refusing to cooperate with the Temporary Receiver or the Temporary

23   Receiver's duly authorized agents in the exercise of their duties or authority under any

24   order of this Court.

25   ## XXI.  STAY OF ACTIONS

26   **IT IS FURTHER ORDERED** that, except by leave of this Court, during the

27   pendency of the receivership ordered herein, Defendants, Defendants' officers, agents,

28   employees, attorneys, and all other persons in active concert or participation with any of

1   them, who receive actual notice of this Order, and their corporations, subsidiaries,

2   divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and

3   other persons seeking to establish or enforce any claim, right, or interest against or on

4   behalf of Defendants, and all others acting for or on behalf of such persons, are hereby

5   enjoined from taking action that would interfere with the exclusive jurisdiction of this

6   Court over the Assets or Documents of the Receivership Entities, including, but not limited

7   to:

8       A.      Filing or assisting in the filing of a petition for relief under the Bankruptcy

9   Code, 11 U.S.C. § 101 *et seq.*, or of any similar insolvency proceeding on behalf of the

10  Receivership Entities;

11      B.      Commencing, prosecuting, or continuing a judicial, administrative, or other

12  action or proceeding against the Receivership Entities, including the issuance or

13  employment of process against the Receivership Entities, except that such actions may be

14  commenced if necessary to toll any applicable statute of limitations; or

15      C.      Filing or enforcing any lien on any asset of the Receivership Entities, taking

16  or attempting to take possession, custody, or control of any Asset of the Receivership

17  Entities; or attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of

18  the Receivership Entities, whether such acts are part of a judicial proceeding, are acts of

19  self-help, or otherwise;

20      Provided, however, that this Order does not stay: (1) the commencement or

21  continuation of a criminal action or proceeding; (2) the commencement or continuation of

22  an action or proceeding by a governmental unit to enforce such governmental unit's police

23  or regulatory power; or (3) the enforcement of a judgment, other than a money judgment,

24  obtained in an action or proceeding by a governmental unit to enforce such governmental

25  unit's police or regulatory power.

26      **XXII. COMPENSATION OF THE TEMPORARY RECEIVER**

27      **IT IS FURTHER ORDERED** that the Temporary Receiver and all personnel hired

28  by the Temporary Receiver as herein authorized, including counsel to the Temporary

- 24 -

1    Receiver and accountants, are entitled to reasonable compensation for the performance of

2    duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by

3    them, from the Assets now held by, in the possession or control of, or which may be

4    received by, the Receivership Entities.  The Temporary Receiver shall file with the Court

5    and serve on the parties periodic requests for the payment of such reasonable

6    compensation, with the first such request filed no more than 60 days after the date of entry

7    of this Order.  The Temporary Receiver shall not increase the hourly rates used as the bases

8    for such fee applications without prior approval of the Court.

9                    **XXIII.      TEMPORARY RECEIVER'S BOND**

10          **IT IS FURTHER ORDERED** that the Receiver is not required to file with the

11   Clerk of this Court a bond until further order of the Court, conditioned that the Receiver

12   will well and truly perform the duties of the office and abide by and perform all acts the

13   Court directs.

14   **XXIV.      IMMEDIATE ACCESS TO BUSINESS PREMISES AND RECORDS**

15          **IT IS FURTHER ORDERED** that:

16          A.      In order to allow Plaintiff and the Temporary Receiver to preserve Assets

17   and evidence relevant to this action and to expedite discovery, Plaintiff and the Temporary

18   Receiver, and their representatives, agents, contractors, and assistants, shall have

19   immediate access to the business premises and storage facilities, owned, controlled, or used

20   by the Receivership Entities.  Such locations include, but are not limited to, 4465 W Sunset

21   Rd, Las Vegas, NV 89118, 2875 St Rose Pkwy Henderson, NV 89052, 18 E Broadway,

22   Winchester, KY 40391 and any offsite location, commercial mailbox, or storage facility

23   used by the Receivership Entities.  The Temporary Receiver may exclude Defendants,

24   Receivership Entities, and their employees from the business premises during the

25   immediate access and subsequently at the Temporary Receiver's discretion.

26          B.      Plaintiff and the Temporary Receiver, and their representatives, agents,

27   contractors, and assistants, are authorized to remove Documents from the Receivership

28   Entities' premises in order that they may be inspected, inventoried, and copied.  Plaintiff

1 | shall return any removed materials to the Temporary Receiver within 5 business days of
2 | completing inventorying and copying, or such time as is agreed upon by Plaintiff and the
3 | Temporary Receiver;

4 |      C.    Plaintiff's access to the Receivership Entities' documents pursuant to this
5 | Section shall not provide grounds for any Defendant to object to any subsequent request
6 | for documents served by Plaintiff;

7 |      D.    Plaintiff and the Temporary Receiver, and their representatives, agents,
8 | contractors, and assistants, are authorized to obtain the assistance of federal, state and local
9 | law enforcement officers as they deem necessary to effect service and to implement
10 | peacefully the provisions of this Order;

11 |      E.    If any Documents, computers, or electronic storage devices containing
12 | information related to the business practices or finances of the Receivership Entities are at
13 | a location other than those listed herein, including personal residence(s) of any Defendant,
14 | then, immediately upon receiving notice of this order, Defendants and Receivership
15 | Entities shall produce to the Temporary Receiver all such Documents, computers, and
16 | electronic storage devices, along with any codes or passwords needed for access.  In order
17 | to prevent the destruction of computer data, upon service of this Order, any such computers
18 | or electronic storage devices shall be powered down in the normal course of the operating
19 | system used on such devices and shall not be powered up or used until produced for
20 | copying and inspection; and

21 |      F.    If any communications or records of any Receivership Entity are stored with
22 | an Electronic Data Host, such entity shall, immediately upon receiving notice of this Order,
23 | provide the Temporary Receiver with the username, passwords, and any other login
24 | credential needed to access the communications and records, and shall not attempt to
25 | access, or cause a third-party to attempt to access, the communications or records.

26 | **XXV. DISTRIBUTION OF ORDER BY DEFENDANTS**

27 |      **IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy
28 | of this Order to each affiliate, telemarketer, marketer, sales entity, successor, assign,

1    member, officer, director, employee, agent, independent contractor, client, attorney,

2    spouse, subsidiary, division, and representative of any Defendant, and shall, within 10 days

3    from the date of entry of this Order provide Plaintiff and the Temporary Receiver with a

4    sworn statement whether this provision of the Order has been satisfied, which statement

5    shall include the names, physical addresses, phone number, and email addresses of each

6    such person or entity who received a copy of the Order. Furthermore, Defendants shall not

7    take any action that would encourage any person who should receive a copy of this Order

8    or any other persons or entities in active concert or participation with them to disregard this

9    Order or believe that they are not bound by its provisions.

10                    **XXVI.**      **EXPEDITED DISCOVERY**

11        **IT IS FURTHER ORDERED** that, notwithstanding the provisions of the Fed. R.

12    Civ. P. 26(d) and (f) and 30(a)(2)(A)(iii), and pursuant to Fed. R. Civ. P. 30(a), 33, 34, and

13    45, Plaintiff and the Temporary Receiver are granted leave, at any time after service of this

14    Order, to conduct limited expedited discovery for the purpose of discovering: (1) the

15    nature, location, status, and extent of Defendants' Assets[3]; (2) the nature, location, and

16    extent of Defendants' business transactions and operations; (3) Documents reflecting

17    Defendants' business transactions and operations; or (4) compliance with this Order. The

18    limited expedited discovery set forth in this Section shall proceed as follows:

19        A.     Plaintiff and the Temporary Receiver may take the deposition of parties and

20    non-parties. Forty-eight (48) hours' notice shall be sufficient notice for such depositions.

21    The limitations and conditions set forth in Rules 30(a)(2)(B) and 31(a)(2)(B) of the Federal

22    Rules of Civil Procedure regarding subsequent depositions of an individual shall not apply

23    to depositions taken pursuant to this Section. Any such deposition taken pursuant to this

24    Section shall not be counted towards the deposition limit set forth in Rules 30(a)(2)(A) and

25    31(a)(2)(A) and depositions may be taken by telephone or other remote electronic means;

26

27

28    [3]    For the reasons set forth in footnote 2, *supra*, Thomas G. Sacca, Jr. is excluded from this requirement. He remains subject to the remaining requirements of this section.

B.      Plaintiff and the Temporary Receiver may serve upon parties requests for production of Documents or inspection that require production or inspection within 5 days of service, provided, however, that 3 days of notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only in an electronic format.

C.      Plaintiff and the Temporary Receiver may serve upon parties interrogatories that require response within 5 days after Plaintiff serves such interrogatories;

D.      The Plaintiff and the Temporary Receiver may serve subpoenas upon non-parties that direct production or inspection within 5 days of service.

E.      Service of discovery upon a party to this action, taken pursuant to this Section, shall be sufficient if made by facsimile, email, or by overnight delivery.

F.      Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Rules 26(d) & (f) of the Federal Rules of Civil Procedure.

G.      The parties are exempted from making initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

## XXVII.      SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order as well as the Motion for Temporary Restraining Order and all other pleadings, Documents, and exhibits filed contemporaneously with that Motion (other than the complaint and summons), may be served by any means, including facsimile transmission, electronic mail or other electronic messaging, personal or overnight delivery, U.S. Mail or FedEx, by agents and employees of Plaintiff, by any law enforcement agency, or by private process server, upon any Defendant or any person (including any financial institution) that may have possession, custody or control of any Asset or Document of any Defendant, or that may be subject to any provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil

1    Procedure.  For purposes of this Section, service upon any branch, subsidiary, affiliate, or

2    office of any entity shall effect service upon the entire entity.

3            **XXVIII.**      **CORRESPONDENCE AND SERVICE ON PLAINTIFF**

4          **IT IS FURTHER ORDERED** that, for the purpose of this Order, all

5    correspondence and service of pleadings on Plaintiff shall be addressed to:

6          Jonathan W. Ware, Esq.

7          Federal Trade Commission

8          Bureau of Consumer Protection | Enforcement Division

9          600 Pennsylvania Avenue, NW, CC-9528

10        Washington, DC 20580

11        T +1 202 326 2726

12        F +1 202 326 3197

13        jware1@ftc.gov

14            **XXIX.**      **PRELIMINARY INJUNCTION HEARING**

15          **IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 65(b), the parties

16    shall appear before this Court in Courtroom 601, Sandra Day O'Connor United States

17    Courthouse, 401 W. Washington Street, Phoenix, Arizona 85003, on <u>January 27, 2020, at</u>

18    <u>9:30 a.m. (Arizona time)</u> for a hearing to show cause, if there is any, why this Court should

19    not enter a preliminary injunction, pending final ruling on the Complaint against

20    Defendants, enjoining the violations of the law alleged in the Complaint, continuing the

21    freeze of their Assets, continuing the receivership, and imposing such additional relief as

22    may be appropriate.

23        **XXX. BRIEFS AND AFFIDAVITS CONCERNING PRELIMINARY**

24                                 **INJUNCTION**

25          **IT IS FURTHER ORDERED** that:

26          A.      Defendants shall file with the Court and serve on Plaintiff's counsel any

27    answering pleadings, affidavits, motions, expert reports or declarations, or legal

28    memoranda no later than 4 days prior to the order to show cause hearing scheduled pursuant

to this Order. Plaintiff may file responsive or supplemental pleadings, materials, affidavits, or memoranda with the Court and serve the same on counsel for Defendants no later than 1 day prior to the order to show cause hearing. Provided that such affidavits, pleadings, motions, expert reports, declarations, legal memoranda or oppositions must be served by personal or overnight delivery, facsimile, or email, and be received by the other party or parties no later than 5:00 p.m. (Arizona time) on the appropriate dates set forth in this Section.

B.      An evidentiary hearing on Plaintiff's request for a preliminary injunction is not necessary unless Defendants demonstrate that they have, and intend to introduce, evidence that raises a genuine and material factual issue. The question of whether this Court should enter a preliminary injunction shall be resolved on the pleadings, declarations, exhibits, and memoranda filed by, and oral argument of, the parties. Live testimony shall be heard only on further order of this Court. Any motion to permit such testimony shall be filed with the Court and served on counsel for the other parties at least 5 days prior to the preliminary injunction hearing in this matter. Such motion shall set forth the name, address, and telephone number of each proposed witness, a detailed summary or affidavit revealing the substance of each proposed witness's expected testimony, and an explanation of why the taking of live testimony would be helpful to this Court. Any papers opposing a timely motion to present live testimony or to present live testimony in response to another party's timely motion to present live testimony shall be filed with this Court and served on the other parties at least 3 days prior to the order to show cause hearing.

Provided, however, that this service shall be performed by personal or overnight delivery, facsimile or email, and Documents shall be delivered so that they shall be received by the other parties no later than 5:00 p.m. (Arizona time) on the appropriate dates provided in this Section.

- 30 -

1

## XXXI.      DURATION OF THE ORDER

2      **IT IS FURTHER ORDERED** that this Order shall expire 14 days from the date of

3    entry noted below, unless within such time, the Order is extended for an additional period

4    pursuant to Fed. R. Civ. P. 65(b)(2).

5

## XXXII.      RETENTION OF JURISDICTION

6      **IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter

7    for all purposes.

8      Dated this 13th day of January, 2020.

9

10

11

12                                                    Dominic W. Lanza
                                                    United States District Judge

13

14

15

16    Cc:  Plaintiff's counsel Evan Mendelson and Jonathan Ware

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:20-cv-00047-DWL *SEALED*   Document 21 *SEALED*   Filed 01/13/20   Page 32 of 64

# Attachment A

**FEDERAL TRADE COMMISSION**

---

**FINANCIAL STATEMENT OF INDIVIDUAL DEFENDANT**

---

**Definitions and Instructions:**

1. Complete all items. Enter "None" or "N/A" ("Not Applicable") in the first field only of any item that does not apply to you. If you cannot fully answer a question, explain why.

2. "Dependents" include your spouse, live-in companion, dependent children, or any other person, whom you or your spouse (or your children's other parent) claimed or could have claimed as a dependent for tax purposes at any time during the past five years.

3. "Assets" and "Liabilities" include ALL assets and liabilities, located within the United States or any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

4. Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number(s) being continued.

5. Type or print legibly.

6. Initial each page in the space provided in the lower right corner.

7. Sign and date the completed financial statement on the last page.


**Penalty for False Information:**

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

(1) "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact; makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

(3) "in any ( . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration" (18 U.S.C. § 1623).

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

# BACKGROUND INFORMATION

## Item 1.  Information About You

| Full Name | | Social Security No. | |
|---|---|---|---|
| Current Address of Primary Residence | | Driver's License No. | State Issued |
| | | Phone Numbers<br>Home: (    )<br>Fax:   (    ) | Date of Birth:      /   /<br>(mm/dd/yyyy)<br>Place of Birth |
| ☐Rent ☐Own        From (Date):       /   /<br>(mm/dd/yyyy) | | E-Mail Address | |
| Internet Home Page | | | |

## Previous Addresses for past five years (if required, use additional pages at end of form)

| Address | From:     /   /<br>(mm/dd/yyyy)          Until:     /   /<br>(mm/dd/yyyy)<br><br>☐Rent ☐Own |
|---|---|
| Address | From:     /   /          Until:   /   /<br><br>☐Rent ☐Own |
| Address | From:     /   /          Until:   /   /<br><br>☐Rent ☐Own |
| Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used: | |

## Item 2.  Information About Your Spouse or Live-In Companion

| Spouse/Companion's Name | | Social Security No. | Date of Birth<br>/   /<br>(mm/dd/yyyy) |
|---|---|---|---|
| Address (if different from yours) | | Phone Number<br>(    ) | Place of Birth |
| | | ☐Rent ☐Own        From (Date):<br>/   /<br>(mm/dd/yyyy) | |
| Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used: | | | |
| Employer's Name and Address | | Job Title | |
| | | Years in Present Job | Annual Gross Salary/Wages<br>$ |

## Item 3.  Information About Your Previous Spouse

| Name and Address | Social Security No. |
|---|---|
| | Date of Birth<br>/   /<br>(mm/dd/yyyy) |

## Item 4.  Contact Information (name and address of closest living relative other than your spouse)

| Name and Address | Phone Number<br>(    ) |
|---|---|
| | |

Initials: _____

## Item 5. Information About Dependents (whether or not they reside with you)

| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
|---|---|---|
| | Relationship | |
| Name and Address | Social Security No | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |

## Item 6. Employment Information/Employment Income

Provide the following information for this year-to-date and for each of the previous five full years, for each business entity of which you were a director, officer, member, partner, employee (including self-employment), agent, owner, shareholder, contractor, participant or consultant at any time during that period. "Income" includes, but is not limited to, any salary, commissions, distributions, draws, consulting fees, loans, loan payments, dividends, royalties, and benefits for which you did not pay (e.g., health insurance premiums, automobile lease or loan payments) received by you or anyone else on your behalf.

| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
|---|---|---|---|---|
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |

Initials: _____

**Item 7.  Pending Lawsuits Filed By or Against You or Your Spouse**
List all pending lawsuits that have been filed by or against you or your spouse in any court or before an administrative agency in the United States or in any foreign country or territory.  *Note:  At Item 12, list lawsuits that resulted in final judgments or settlements in your favor.  At Item 21, list lawsuits that resulted in final judgments or settlements against you.*

| Caption of Proceeding | Court or Agency and Location | Case No. | Nature of Proceeding | Relief Requested | Status or Disposition |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**Item 8.  Safe Deposit Boxes**
List all safe deposit boxes, located within the United States or in any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents.

| Name of Owner(s) | Name & Address of Depository Institution | Box No. | Contents |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Initials: _____

# FINANCIAL INFORMATION

**REMINDER:** When an item asks for information regarding your "assets" and "liabilities" include <u>ALL</u> assets and liabilities, located within the United States or in any foreign country or territory, or institution, whether held individually or jointly, and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents. In addition, provide all documents requested in Item 24 with your completed Financial Statement.

## ASSETS

### Item 9.  Cash, Bank, and Money Market Accounts

List cash on hand (as opposed to cash in bank accounts or other financial accounts) and all bank accounts, money market accounts, or other financial accounts, including but not limited to checking accounts, savings accounts, and certificates of deposit.  The term "cash on hand" includes but is not limited to cash in the form of currency, uncashed checks, and money orders.

a.  Amount of Cash on Hand  $ _____     Form of Cash on Hand _____

| b.  Name on Account | Name & Address of Financial Institution | Account No. | Current Balance |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |

### Item 10.  Publicly Traded Securities

List all publicly traded securities, including but not limited to, stocks, stock options, corporate bonds, mutual funds, U.S. government securities (including but not limited to treasury bills and treasury notes), and state and municipal bonds.  Also list any U.S. savings bonds.

| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
|---|---|---|---|---|
| Broker House, Address | | Broker Account No. | | |
|  |  | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No | | |
|  |  | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No. | | |
|  |  | Current Fair Market Value $ | Loan(s) Against Security $ | |

Initials: _____

## Item 11.  Non-Public Business and Financial Interests

List all non-public business and financial interests, including but not limited to any interest in a non-public corporation, subchapter-S corporation, limited liability corporation ("LLC"), general or limited partnership, joint venture, sole proprietorship, international business corporation or personal investment corporation, and oil or mineral lease.

| Entity's Name & Address | Type of Business or Financial Interest (e.g., LLC, partnership) | Owner (e.g., self, spouse) | Ownership % | If Officer, Director, Member or Partner, Exact Title |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Item 12.  Amounts Owed to You, Your Spouse, or Your Dependents

| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
|---|---|---|---|
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |
| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |

## Item 13.  Life Insurance Policies

List all life insurance policies (including endowment policies) with any cash surrender value

| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
|---|---|---|---|
| | Insured | Loans Against Policy $ | Surrender Value $ |
| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
| | Insured | Loans Against Policy $ | Surrender Value $ |

## Item 14.  Deferred Income Arrangements

List all deferred income arrangements, including but not limited to, deferred annuities, pensions plans, profit-sharing plans, 401(k) plans, IRAs, Keoghs, other retirement accounts, and college savings plans (e.g., 529 Plans).

| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | Account No. | |
|---|---|---|---|
| | Date Established / / (mm/dd/yyyy) | Type of Plan | Surrender Value before Taxes and Penalties $ |
| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | Account No. | |
| | Date Established / / | Type of Plan | Surrender Value before Taxes and Penalties $ |

Initials: _____

## Item 15.  Pending Insurance Payments or Inheritances

List any pending insurance payments or inheritances owed to you.

| Type | Amount Expected | Date Expected  (mm/dd/yyyy) |
|---|---|---|
|  | $ | /  / |
|  | $ | /  / |
|  | $ | /  / |

## Item 16.  Vehicles

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles.

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

## Item 17.  Other Personal Property

List all other personal property not listed in Items 9-16 by category, whether held for personal use, investment or any other reason, including but not limited to coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property.

| Property  Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
|  |  |  | $ | $ |
|  |  |  | $ | $ |
|  |  |  | $ | $ |

Initials: _____

## Item 18.  Real Property
List all real property interests (including any land contract)

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |
|---|---|---|
| | | |

| Acquisition Date (mm/dd/yyyy)<br>/    / | Purchase Price<br>$ | Current Value<br>$ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract<br>$ |
|---|---|---|
| | | Monthly Payment<br>$ |

| Other Mortgage Loan(s) (describe) | Monthly Payment<br>$ | ☐ Rental Unit |
|---|---|---|
| | Current Balance<br>$ | Monthly Rent Received<br>$ |

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |
|---|---|---|
| | | |

| Acquisition Date (mm/dd/yyyy)<br>/    / | Purchase Price<br>$ | Current Value<br>$ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract<br>$ |
|---|---|---|
| | | Monthly Payment<br>$ |

| Other Mortgage Loan(s) (describe) | Monthly Payment<br>$ | ☐ Rental Unit |
|---|---|---|
| | Current Balance<br>$ | Monthly Rent Received<br>$ |

# LIABILITIES

## Item 19.  Credit Cards
List each credit card account held by you, your spouse, or your dependents, and any other credit cards that you, your spouse, or your dependents use, whether issued by a United States or foreign financial institution.

| Name of Credit Card (e.g., Visa, MasterCard, Department Store) | Account No. | Name(s) on Account | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

## Item 20.  Taxes Payable
List all taxes, such as income taxes or real estate taxes, owed by you, your spouse, or your dependents.

| Type of Tax | Amount Owed | Year Incurred |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |

Initials: _____

## Item 21.  Other Amounts Owed by You, Your Spouse, or Your Dependents

List all other amounts, not listed elsewhere in this financial statement, owed by you, your spouse, or your dependents.

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) |
| | Lender/Creditor's Relationship to You |

| Date Liability Was Incurred<br>/   /<br>(mm/dd/yyyy) | Original Amount Owed<br>$ | Current Amount Owed<br>$ | Payment Schedule |

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) |
| | Lender/Creditor's Relationship to You |

| Date Liability Was Incurred<br>/   /<br>(mm/dd/yyyy) | Original Amount Owed<br>$ | Current Amount Owed<br>$ | Payment Schedule |

## OTHER FINANCIAL INFORMATION

## Item 22.  Trusts and Escrows

List all funds and other assets that are being held in trust or escrow by any person or entity for you, your spouse, or your dependents.  Include any legal retainers being held on your behalf by legal counsel.  Also list all funds or other assets that are being held in trust or escrow by you, your spouse, or your dependents, for any person or entity.

| Trustee or Escrow Agent's Name & Address | Date Established (mm/dd/yyyy) | Grantor | Beneficiaries | Present Market Value of Assets* |
|---|---|---|---|---|
| | /   / | | | $ |
| | /   / | | | $ |
| | /   / | | | $ |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

## Item 23.  Transfers of Assets

List each person or entity to whom you have transferred, in the aggregate, more than $5,000 in funds or other assets during the previous five years by loan, gift, sale, or other transfer (exclude ordinary and necessary living and business expenses paid to unrelated third parties).  For each such person or entity, state the total amount transferred during that period.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value* | Transfer Date (mm/dd/yyyy) | Type of Transfer (e.g., Loan, Gift) |
|---|---|---|---|---|
| | | $ | /   / | |
| | | $ | /   / | |
| | | $ | /   / | |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

Initials: _____

**Item 24.  Document Requests**
Provide copies of the following documents with your completed Financial Statement.

|  |  |
|---|---|
|  | Federal tax returns filed during the last three years by or on behalf of you, your spouse, or your dependents. |
|  | All applications for bank loans or other extensions of credit (other than credit cards) that you, your spouse, or your dependents have submitted within the last two years, including by obtaining copies from lenders if necessary. |
| Item 9 | For each bank account listed in Item 9, all account statements for the past 3 years. |
| Item 11 | For each business entity listed in Item 11, provide (including by causing to be generated from accounting records) the most recent balance sheet, tax return, annual income statement, the most recent year-to-date income statement, and all general ledger files from account records. |
| Item 17 | All appraisals that have been prepared for any property listed in Item 17, including appraisals done for insurance purposes.  You may exclude any category of property where the total appraised value of all property in that category is less than $2,000. |
| Item 18 | All appraisals that have been prepared for real property listed in Item 18 |
| Item 21 | Documentation for all debts listed in Item 21. |
| Item 22 | All executed documents for any trust or escrow listed in Item 22.  Also provide any appraisals, including insurance appraisals that have been done for any assets held by any such trust or in any such escrow. |

## SUMMARY FINANCIAL SCHEDULES

**Item 25.  Combined Balance Sheet for You, Your Spouse, and Your Dependents**

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand (Item 9) | $ | Loans Against Publicly Traded Securities (Item 10) | $ |
| Funds Held in Financial Institutions (Item 9) | $ | Vehicles - Liens (Item 16) | $ |
| U.S. Government Securities (Item 10) | $ | Real Property – Encumbrances (Item 18) | $ |
| Publicly Traded Securities (Item 10) | $ | Credit Cards (Item 19) | $ |
| Non-Public Business and Financial Interests (Item 11) | $ | Taxes Payable (Item 20) | $ |
| Amounts Owed to You (Item 12) | $ | Amounts Owed by You (Item 21) | $ |
| Life Insurance Policies (Item 13) | $ | **Other Liabilities (Itemize)** | |
| Deferred Income Arrangements (Item 14) | $ | | $ |
| Vehicles (Item 16) | $ | | $ |
| Other Personal Property (Item 17) | $ | | $ |
| Real Property (Item 18) | $ | | $ |
| **Other Assets (Itemize)** | | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| **Total Assets** | $ | **Total Liabilities** | $ |

**Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents**
Provide the current monthly income and expenses for you, your spouse, and your dependents.  Do not include credit card payments separately; rather, include credit card expenditures in the appropriate categories.

| Income (State source of each item) | | Expenses | |
|---|---|---|---|
| Salary - After Taxes<br>Source: | $ | Mortgage or Rental Payments for Residence(s) | $ |
| Fees, Commissions, and Royalties<br>Source: | $ | Property Taxes for Residence(s) | $ |
| Interest<br>Source: | $ | Rental Property Expenses, Including Mortgage Payments, Taxes, and Insurance | $ |
| Dividends and Capital Gains<br>Source | $ | Car or Other Vehicle Lease or Loan Payments | $ |
| Gross Rental Income<br>Source: | $ | Food Expenses | $ |
| Profits from Sole Proprietorships<br>Source: | $ | Clothing Expenses | $ |
| Distributions from Partnerships, S-Corporations, and LLCs<br>Source: | $ | Utilities | $ |

Initials: _____

| Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents (cont.) | | | | |
|---|---|---|---|---|
| Distributions from Trusts and Estates<br>Source: | $ | | Medical Expenses, Including Insurance | $ |
| Distributions from Deferred Income Arrangements<br>Source: | $ | | Other Insurance Premiums | $ |
| Social Security Payments | $ | | Other Transportation Expenses | $ |
| Alimony/Child Support Received | $ | | **Other Expenses (Itemize)** | |
| Gambling Income | $ | | | $ |
| **Other Income (Itemize)** | | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| **Total Income** | $ | | **Total Expenses** | $ |

## ATTACHMENTS

| Item 27.  Documents Attached to this Financial Statement<br>List all documents that are being submitted with this financial statement.  For any Item 24 documents that are not attached, explain why. | |
|---|---|
| Item No. Document Relates To | Description of Document |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

        I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court.  I have used my best efforts to obtain the information requested in this statement.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge.  I have provided all requested documents in my custody, possession, or control.  I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines).  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____
(Date)

_____
Signature

# Attachment B

# FEDERAL TRADE COMMISSION

## FINANCIAL STATEMENT OF CORPORATE DEFENDANT

**Instructions**:

1.  Complete all items. Enter "None" or "N/A" ("Not Applicable") where appropriate. If you cannot fully answer a question, explain why.

2.  The font size within each field will adjust automatically as you type to accommodate longer responses.

3.  In completing this financial statement, "the corporation" refers not only to this corporation but also to each of its predecessors that are not named defendants in this action.

4.  When an Item asks for information about assets or liabilities "held by the corporation," include ALL such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.

5.  Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number being continued.

6.  Type or print legibly.

7.  An officer of the corporation must sign and date the completed financial statement on the last page and initial each page in the space provided in the lower right corner.

**Penalty for False Information**:

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

> (1) "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

> (2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

> (3) "in any (. . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration." (18 U.S.C. § 1623)

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

# BACKGROUND INFORMATION

**Item 1.**          **General Information**

Corporation's Full Name _____

Primary Business Address _____ From (Date) _____

Telephone No. _____ Fax No. _____

E-Mail Address_____ Internet Home Page_____

All other current addresses & previous addresses for past five years, including post office boxes and mail drops:

Address_____ From/Until_____

Address_____ From/Until_____

Address_____ From/Until_____

All predecessor companies for past five years:

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

**Item 2.**          **Legal Information**

Federal Taxpayer ID No. _____ State & Date of Incorporation _____

State Tax ID No. _____ State _____ Profit or Not For Profit _____

Corporation's Present Status:  Active _____ Inactive _____ Dissolved _____

If Dissolved:  Date dissolved _____ By Whom _____

Reasons _____

Fiscal Year-End (Mo./Day) _____ Corporation's Business Activities _____

**Item 3.**          **Registered Agent**

Name of Registered Agent _____

Address _____ Telephone No. _____

Initials _____

**Item 4.**       **Principal Stockholders**

List all persons and entities that own at least 5% of the corporation's stock.

| Name & Address | % Owned |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |

**Item 5.**       **Board Members**

List all members of the corporation's Board of Directors.

| Name & Address | % Owned | Term (From/Until) |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Item 6.**       **Officers**

List all of the corporation's officers, including *de facto* officers (individuals with significant management responsibility whose titles do not reflect the nature of their positions).

| Name & Address | % Owned |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**Item 7.**          **Businesses Related to the Corporation**

List all corporations, partnerships, and other business entities in which this corporation has an ownership interest.

| Name & Address | Business Activities | % Owned |
|---|---|---|
| | | |
| | | |
| | | |

State which of these businesses, if any, has ever transacted business with the corporation _____

_____

**Item 8.**          **Businesses Related to Individuals**

List all corporations, partnerships, and other business entities in which the corporation's principal stockholders, board members, or officers (i.e., the individuals listed in Items 4 - 6 above) have an ownership interest.

| Individual's Name | Business Name & Address | Business Activities | % Owned |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

State which of these businesses, if any, have ever transacted business with the corporation _____

_____

**Item 9.**          **Related Individuals**

List all related individuals with whom the corporation has had any business transactions during the three previous fiscal years and current fiscal year-to-date.  A "related individual" is a spouse, sibling, parent, or child of the principal stockholders, board members, and officers (i.e., the individuals listed in Items 4 - 6 above).

| Name and Address | Relationship | Business Activities |
|---|---|---|
| | | |
| | | |
| | | |

Initials _____

**Item 10.**       **Outside Accountants**

List all outside accountants retained by the corporation during the last three years.

| Name | Firm Name | Address | CPA/PA? |
|------|-----------|---------|---------|
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |

**Item 11.**       **Corporation's Recordkeeping**

List all individuals within the corporation with responsibility for keeping the corporation's financial books and records for the last three years.

| Name, Address, & Telephone Number | Position(s) Held |
|-----------------------------------|------------------|
|                                   |                  |
|                                   |                  |
|                                   |                  |
|                                   |                  |

**Item 12.**       **Attorneys**

List all attorneys retained by the corporation during the last three years.

| Name | Firm Name | Address |
|------|-----------|---------|
|      |           |         |
|      |           |         |
|      |           |         |
|      |           |         |
|      |           |         |

Initials _____

**Item 13.**         **Pending Lawsuits Filed by the Corporation**

List all pending lawsuits that have been filed by the corporation in court or before an administrative agency.  (List lawsuits that resulted in final judgments or settlements in favor of the corporation in Item 25).

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Initials _____

Item 14.        **Current Lawsuits Filed Against the Corporation**

List all pending lawsuits that have been filed against the corporation in court or before an administrative agency.  (List lawsuits that resulted in final judgments, settlements, or orders in Items 26 - 27).

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Relief Requested _____ Nature of Lawsuit _____

_____ Status _____

Initials _____

<u>Item 15.</u>        **Bankruptcy Information**

List all state insolvency and federal bankruptcy proceedings involving the corporation.

Commencement Date _____ Termination Date _____ Docket No. _____

If State Court: Court & County _____ If Federal Court: District _____

Disposition _____

<u>Item 16.</u>        **Safe Deposit Boxes**

List all safe deposit boxes, located within the United States or elsewhere, held by the corporation, or held by others for the benefit of the corporation. *On a separate page, describe the contents of each box.*

| <u>Owner's Name</u> | <u>Name & Address of Depository Institution</u> | <u>Box No.</u> |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

## FINANCIAL INFORMATION

**REMINDER:  When an Item asks for information about assets or liabilities "held by the corporation," include <u>ALL</u> such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.**

<u>Item 17.</u>        **Tax Returns**

List all federal and state corporate tax returns filed for the last three complete fiscal years. *Attach copies of all returns.*

| <u>Federal/ State/Both</u> | <u>Tax Year</u> | <u>Tax Due Federal</u> | <u>Tax Paid Federal</u> | <u>Tax Due State</u> | <u>Tax Paid State</u> | <u>Preparer's Name</u> |
|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | |
| | | $ | $ | $ | $ | |
| | | $ | $ | $ | $ | |

Initials _____

<u>Item 18.</u>          **Financial Statements**

List all financial statements that were prepared for the corporation's last three complete fiscal years and for the current fiscal year-to-date. *Attach copies of all statements, providing audited statements if available.*

| <u>Year</u> | <u>Balance Sheet</u> | <u>Profit & Loss Statement</u> | <u>Cash Flow Statement</u> | <u>Changes in Owner's Equity</u> | <u>Audited?</u> |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

<u>Item 19.</u>          **Financial Summary**

For each of the last three complete fiscal years and for the current fiscal year-to-date for which the corporation has not provided a profit and loss statement in accordance with Item 18 above, provide the following summary financial information.

| | <u>Current Year-to-Date</u> | <u>1 Year Ago</u> | <u>2 Years Ago</u> | <u>3 Years Ago</u> |
|---|---|---|---|---|
| <u>Gross Revenue</u> | $_____ | $_____ | $_____ | $_____ |
| <u>Expenses</u> | $_____ | $_____ | $_____ | $_____ |
| <u>Net Profit After Taxes</u> | $_____ | $_____ | $_____ | $_____ |
| <u>Payables</u> | $_____ | | | |
| <u>Receivables</u> | $_____ | | | |

<u>Item 20.</u>          **Cash, Bank, and Money Market Accounts**

List cash and all bank and money market accounts, including but not limited to, checking accounts, savings accounts, and certificates of deposit, held by the corporation. The term "cash" includes currency and uncashed checks.

Cash on Hand $_____   Cash Held for the Corporation's Benefit $_____

| <u>Name & Address of Financial Institution</u> | <u>Signator(s) on Account</u> | <u>Account No.</u> | <u>Current Balance</u> |
|---|---|---|---|
| | | | $_____ |
| | | | $_____ |
| | | | $_____ |
| | | | $_____ |

**Item 21.**        **Government Obligations and Publicly Traded Securities**

List all U.S. Government obligations, including but not limited to, savings bonds, treasury bills, or treasury notes, held by the corporation.  Also list all publicly traded securities, including but not limited to, stocks, stock options, registered and bearer bonds, state and municipal bonds, and mutual funds, held by the corporation.

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

**Item 22.**        **Real Estate**

List all real estate, including leaseholds in excess of five years, held by the corporation.

Type of Property_____ Property's Location_____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____

Type of Property_____ Property's Location_____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____

Initials _____

**Item 23.**          **Other Assets**

List all other property, by category, with an estimated value of $2,500 or more, held by the corporation, including but not limited to, inventory, machinery, equipment, furniture, vehicles, customer lists, computer software, patents, and other intellectual property.

| Property Category | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |

**Item 24.**          **Trusts and Escrows**

List all persons and other entities holding funds or other assets that are in escrow or in trust for the corporation.

| Trustee or Escrow Agent's Name & Address | Description and Location of Assets | Present Market Value of Assets |
|---|---|---|
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |
| _____ | _____ | $_____ |

**Item 25.**          **Monetary Judgments and Settlements Owed To the Corporation**

List all monetary judgments and settlements, recorded and unrecorded, owed to the corporation.

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____


**Item 26.**          **Monetary Judgments and Settlements Owed By the Corporation**

List all monetary judgments and settlements, recorded and unrecorded, owed by the corporation.

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date _____ Amount $ _____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No. _____

Nature of Lawsuit _____ Date of Judgment _____ Amount $ _____

**Item 27.**          **Government Orders and Settlements**

List all existing orders and settlements between the corporation and any federal or state government entities.

Name of Agency _____ Contact Person _____

Address _____ Telephone No. _____

Agreement Date _____ Nature of Agreement _____

**Item 28.**          **Credit Cards**

List all of the corporation's credit cards and store charge accounts and the individuals authorized to use them.

| Name of Credit Card or Store | Names of Authorized Users and Positions Held |
| --- | --- |
| | |
| | |
| | |
| | |
| | |

**Item 29.**          **Compensation of Employees**

List all compensation and other benefits received from the corporation by the five most highly compensated employees, independent contractors, and consultants (other than those individuals listed in Items 5 and 6 above), for the two previous fiscal years and current fiscal year-to-date. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, bonuses, dividends, distributions, royalties, pensions, and profit sharing plans. "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
| --- | --- | --- | --- | --- |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |

Initials _____

**Item 30.**      **Compensation of Board Members and Officers**

List all compensation and other benefits received from the corporation by each person listed in Items 5 and 6, for the current fiscal year-to-date and the two previous fiscal years. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, dividends, distributions, royalties, pensions, and profit sharing plans. "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
|---|---|---|---|---|
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |

**Item 31.**      **Transfers of Assets Including Cash and Property**

List all transfers of assets over $2,500 made by the corporation, other than in the ordinary course of business, during the previous three years, by loan, gift, sale, or other transfer.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value | Transfer Date | Type of Transfer (e.g., Loan, Gift) |
|---|---|---|---|---|
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |

Initials _____

**Item 32.**        **Documents Attached to the Financial Statement**

List all documents that are being submitted with the financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

        I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____          _____
(Date)                                    Signature


                                          _____
                                          Corporate Position

Initials _____

# Attachment C

Form **4506**

(July 2017)

Department of the Treasury
Internal Revenue Service

# Request for Copy of Tax Return

▶ Do not sign this form unless all applicable lines have been completed.
▶ Request may be rejected if the form is incomplete or illegible.
▶ For more information about Form 4506, visit *www.irs.gov/form4506*.

OMB No. 1545-0429

**Tip.** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the original tax return and usually contains the information that a third party (such as a mortgage company) requires. See Form 4506-T, Request for Transcript of Tax Return, or you can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Get a Tax Transcript..." or call 1-800-908-9946.

| | |
|---|---|
| **1a** Name shown on tax return. If a joint return, enter the name shown first. | **1b** First social security number on tax return, individual taxpayer identification number, or employer identification number (see instructions) |
| **2a** If a joint return, enter spouse's name shown on tax return. | **2b** Second social security number or individual taxpayer identification number if joint tax return |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code (see instructions)

**4** Previous address shown on the last return filed if different from line 3 (see instructions)

**5** If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number.

**Caution:** If the tax return is being mailed to a third party, ensure that you have filled in lines 6 and 7 before signing. Sign and date the form once you have filled in these lines. Completing these steps helps to protect your privacy. Once the IRS discloses your tax return to the third party listed on line 5, the IRS has no control over what the third party does with the information. If you would like to limit the third party's authority to disclose your return information, you can specify this limitation in your written agreement with the third party.

**6** **Tax return requested.** Form 1040, 1120, 941, etc. and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____

**Note:** If the copies must be certified for court or administrative proceedings, check here . . . . . . . . . . . . . . . . ☐

**7** **Year or period requested.** Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than eight years or periods, you must attach another Form 4506.

_____   _____   _____   _____

_____   _____   _____   _____

**8** **Fee.** There is a $50 fee for each return requested. **Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN, ITIN, or EIN and "Form 4506 request" on your check or money order.**

| | | | |
|---|---|---|---|
| **a** | Cost for each return . . . . . . . . . . . . . . . . . . . . | $ | 50.00 |
| **b** | Number of returns requested on line 7 . . . . . . . . . . . . . | | |
| **c** | Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . | $ | |

**9** If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . . . ☐

**Caution:** Do not sign this form unless all applicable lines have been completed.

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, at least one spouse must sign. If signed by a corporate officer, 1 percent or more shareholder, partner, managing member, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer. **Note:** This form must be received by IRS within 120 days of the signature date.

☐ **Signatory attests that he/she has read the attestation clause and upon so reading declares that he/she has the authority to sign the Form 4506.** See instructions.

Phone number of taxpayer on line 1a or 2a

**Sign Here**

| | | |
|---|---|---|
| ▶ | **Signature** (see instructions) | Date |
| | **Title** (if line 1a above is a corporation, partnership, estate, or trust) | |
| ▶ | **Spouse's signature** | Date |

For Privacy Act and Paperwork Reduction Act Notice, see page 2.

Cat. No. 41721E

Form **4506** (Rev. 7-2017)

Form 4506 (Rev. 7-2017)                                                                                                                                Page **2**

Section references are to the Internal Revenue Code unless otherwise noted.

## Future Developments

For the latest information about Form 4506 and its instructions, go to *www.irs.gov/form4506*. Information about any recent developments affecting Form 4506, Form 4506-T and Form 4506T-EZ will be posted on that page.

## General Instructions

**Caution:** Do not sign this form unless all applicable lines have been completed.

**Purpose of form.** Use Form 4506 to request a copy of your tax return. You can also designate (on line 5) a third party to receive the tax return.

**How long will it take?** It may take up to 75 calendar days for us to process your request.

**Tip.** Use Form 4506-T, Request for Transcript of Tax Return, to request tax return transcripts, tax account information, W-2 information, 1099 information, verification of nonfiling, and records of account.

**Automated transcript request.** You can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Get a Tax Transcript..." or call 1-800-908-9946.

**Where to file.** Attach payment and mail Form 4506 to the address below for the state you lived in, or the state your business was in, when that return was filed. There are two address charts: one for individual returns (Form 1040 series) and one for all other returns.

If you are requesting a return for more than one year or period and the chart below shows two different addresses, send your request to the address based on the address of your most recent return.

## Chart for individual returns (Form 1040 series)

| If you filed an individual return and lived in: | Mail to: |
| --- | --- |
| Alabama, Kentucky, Louisiana, Mississippi, Tennessee, Texas, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team Stop 6716 AUSC Austin, TX 73301 |
| Alaska, Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, Wisconsin, Wyoming | Internal Revenue Service RAIVS Team Stop 37106 Fresno, CA 93888 |
| Connecticut, Delaware, District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia | Internal Revenue Service RAIVS Team Stop 6705 P-6 Kansas City, MO 64999 |

## Chart for all other returns

| If you lived in or your business was in: | Mail to: |
| --- | --- |
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409 |
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Internal Revenue Service RAIVS Team P.O. Box 145500 Stop 2800 F Cincinnati, OH 45250 |

## Specific Instructions

**Line 1b.** Enter your employer identification number (EIN) if you are requesting a copy of a business return. Otherwise, enter the first social security number (SSN) or your individual taxpayer identification number (ITIN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 3.** Enter your current address. If you use a P O box, please include it on this line 3.

**Line 4.** Enter the address shown on the last return filed if different from the address entered on line 3.

**Note:** If the addresses on lines 3 and 4 are different and you have not changed your address with the IRS, file Form 8822, Change of Address. For a business address, file Form 8822-B, Change of Address or Responsible Party — Business.

**Signature and date.** Form 4506 must be signed and dated by the taxpayer listed on line 1a or 2a. The IRS must receive Form 4506 within 120 days of the date signed by the taxpayer or it will be rejected. Ensure that all applicable lines are completed before signing.



*You must check the box in the signature area to acknowledge you have the authority to sign and request the information. The form will not be processed and returned to you if the box is unchecked.*

**Individuals.** Copies of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506 exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506 can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer. A bona fide shareholder of record owning 1 percent or more of the outstanding stock of the corporation may submit a Form 4506 but must provide documentation to support the requester's right to receive the information.

**Partnerships.** Generally, Form 4506 can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

**All others.** See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Note:** If you are Heir at law, Next of kin, or Beneficiary you must be able to establish a material interest in the estate or trust.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the letters testamentary authorizing an individual to act for an estate.

**Signature by a representative.** A representative can sign Form 4506 for a taxpayer only if this authority has been specifically delegated to the representative on Form 2848, line 5. Form 2848 showing the delegation must be attached to Form 4506

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested return(s) under the Internal Revenue Code. We need this information to properly identify the return(s) and respond to your request. If you request a copy of a tax return, sections 6103 and 6109 require you to provide this information, including your SSN or EIN, to process your request. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103

The time needed to complete and file Form 4506 will vary depending on individual circumstances. The estimated average time is: **Learning about the law or the form,** 10 min.; **Preparing the form,** 16 min., and **Copying, assembling, and sending the form to the IRS,** 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506 simpler, we would be happy to hear from you. You can write to:

Internal Revenue Service
Tax Forms and Publications Division
1111 Constitution Ave. NW, IR-6526
Washington, DC 20224.

Do not send the form to this address. Instead, see *Where to file* on this page.

# Attachment D

## CONSENT TO RELEASE FINANCIAL RECORDS

I, _____ of _____, (City, State), do hereby direct any bank, saving and loan association, credit union, depository institution, finance company, commercial lending company, credit card processor, credit card processing entity, automated clearing house, network transaction processor, bank debit processing entity, automated clearing house, network transaction processor, bank debit processing entity, brokerage house, escrow agent, money market or mutual fund, title company, commodity trading company, trustee, or person that holds, controls, or maintains custody of assets, wherever located, that are owned or controlled by me or at which there is an account of any kind upon which I am authorized to draw, and its officers, employees, and agents, to disclose all information and deliver copies of all documents of every nature in its possession or control which relate to the said accounts to any attorney of the Federal Trade Commission, and to give evidence relevant thereto, in the matter of [          ], now pending in the United States District Court of [          ], and this shall be irrevocable authority for so doing.

This direction is intended to apply to the laws of countries other than the United States of America which restrict or prohibit disclosure of bank or other financial information without the consent of the holder of the account, and shall be construed as consent with respect hereto, and the same shall apply to any of the accounts for which I may be a relevant principal.

Dated:_____    Signature:_____

Printed Name:_____



**Warren J. Stapleton**

wstapleton@omlaw.com

2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012

Direct Line  602 640.9354

Telephone  602 640 9000
Facsimile  602 640 9050
omlaw.com

January 16, 2020

**Via FEDERAL EXPRESS**

Court Clerk
U.S. District Court, District of Colorado
Alfred A. Arraj U.S. Courthouse
901 19th Street
Denver, CO 80294-3589

Re:   *Federal Trade Commission v. James Noland, Success by Media, LLC, et al.,* Case
      No. CV 20-00047-PHX-DWL, United States District Court, District of Arizona

Dear Mr./Madame Clerk:

Enclosed please find Kimberly Friday, the Temporary Receiver (the "Receiver"), notice pursuant to 28 U.S.C. § 754 of the receivership created under the Arizona District Court's Temporary Restraining Order ("TRO") entered in the above-captioned matter on January 13, 2020.  It is my understanding that this notice needs to be filed with the Court within 10 days of the Receiver's appointment – no later than January 23, 2020 (although it may be January 27, 2020 as the statute predates the civil rules' changes regarding calculation of time).  It is my further understanding that clerk's offices typically deal with these notices by creating a miscellaneous matter, with a new civil matter number, and filing the notice in that proceeding.

Please feel free to call if you have any questions.

Sincerely,

Warren J. Stapleton

WJS:pln
cc:    Kimberly Friday

